UNITED STATES of America, Appellee,

v.

Frank J. Sacco, a/k/a "St. Francis Sacco," Frank Armento III, a/k/a "Robert Simone," and Lewis NOVOD, Defendants,

Lewis Novod, Defendant–Appellant.

No. 1179, Docket 90–1002.

United States Court of Appeals, Second Circuit.

Argued May 3, 1990.

Decided Jan. 17, 1991.

Rehearing Granted March 11, 1991.*

* See 927 F.2d 726.

Barbara Guss, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for S.D.N.Y. and Joan McPhee, Asst. U.S. Atty., of counsel), for appellee.

Anthony J. Ferrara, New York City (Polstein & Ferrara, New York City, Robert Polstein, and Joseph Bilotta, of counsel), for defendant-appellant.

Before LUMBARD, FEINBERG and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

Lewis Novod appeals his conviction on seven counts of perjury, six counts of mail fraud, seven counts of wire fraud, and one count of conspiracy following a December 1989 jury trial in the District Court for the Southern District of New York. He was acquitted of three counts of mail fraud and one count of perjury. Judge Vincent L. Broderick imposed concurrent sentences of ten months' imprisonment followed by three years' supervised release. We affirm the perjury and conspiracy counts, and reverse the conviction on the wire and mail fraud counts.

Novod was indicted and tried for his part in assisting Frank Sacco and his nephew, Frank Armento, in their fraudulent attempt to obtain a permit to operate a waste dumpsite in New York State. Sacco and Armento owned and operated five such dumpsites throughout the State in the 1980s. In 1987, the State's Department of Environmental Conservation ("NYSDEC") closed three of those sites, located in Ramapo, Cornwall, and Tuxedo, for violations of New York environmental law. NYSDEC also required Sacco to post a $4.5 million bond for the cleanup at the Tuxedo site. In 1988, NYSDEC closed the other two sites, located in Kent and Patterson, New York.

In 1988, Sacco and Armento agreed to purchase a nineteen-acre dumpsite in Montgomery, New York for $1 million. The purchase agreement was contingent upon the transfer of the site's current dumping permit—under which its owners were allowed to dispose of construction and demolition debris at the property—to Sacco and Armento. Aware of their reputation with State officials because of their history of dumpsite violations, Sacco and Armento formed the Disposal Enterprise Corporation ("DEC") to conduct the purchase and thereby conceal their identities. They also enlisted Stanley Dulman and Samuel Miller to serve as "front men," and later hired Novod as their attorney. Novod had previously represented Armento in matters related to violations at the Kent and Patterson sites.

On May 2 and 6, 1988, Novod, on DEC's behalf, mailed letters to NYSDEC stating that Dulman and Miller were the corporation's principals and that Miller would supervise the site. NYSDEC officials decided to treat the DEC application as one for a new permit instead of as one for a permit transfer and they met on May 24 with Novod and other DEC representatives. A NYSDEC attorney, Judith Ferry, expressed concerns about the application, remarking that a corporation named Athena I and operated by Armento had recently been cited for dumping at the Montgomery dumpsite in violation of the current permit. Ferry then asked Novod and the DEC representatives whether DEC was connected in any way with Armento or Athena I. According to Ferry, "[t]he response was in the negative. All of the parties indicated they had no association with any of those individuals and, indeed, appeared unfamiliar with the names." The meeting concluded with Novod requesting an interim permit for DEC. Novod wrote to NYSDEC on May 25 stating that Miller would "assume complete supervision of this project" and that Dulman had withdrawn from his duties with DEC because of "ill health."

At a meeting in July, Ferry told Novod that Armento and Sacco had recently been found in violation of the environmental laws. She advised Novod that NYSDEC would require Miller, on DEC's behalf, to sign an affidavit stating that neither he nor DEC had any relationship with Armento or Athena I. Although, after reading the proposed affidavit, Miller was concerned about its inclusion of a statement that he had no business relationship with Armento, Novod instructed him to sign anyway. According to Miller, Novod "told me that I had no business dealing with Frank Armento, [that] I hadn't had one; and that it was no problem, to just sign [the affidavit] and mail it back to him." As submitted to NYSDEC, Miller's affidavit was notarized by Novod's signature and notary stamp.

In September 1988, Novod testified, under subpoena, before the grand jury investigating Sacco's possible environmental vio-

lations and repeatedly denied knowledge of Sacco's and Armento's ties to DEC. For example, he stated, in response to a question, that Sacco has "no hidden interest" in DEC. He also denied that Armento had "anything to do with" DEC.

On October 7, 1988, the grand jury returned a sixteen-count indictment against Novod, Sacco and Armento. Novod was named in three of the counts, alleging mail fraud in violation of 18 U.S.C. §§ 1341 and 1342 and perjury in violation of 18 U.S.C. § 1623. The mail fraud count alleged that the defendants used the mails "with the aim of defrauding the New York State Department of Environmental Conservation and the inhabitants of Montgomery, New York and surrounding geographical areas into awarding a lucrative permit or transfer of permit to conduct alleged construction and demolition debris dumping." Novod moved, in part, to dismiss that count because it alleged only a scheme to defraud the State of an intangible right, arguing that schemes with such objectives do not fall within the mail fraud statute as construed in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). A hearing was held before Chief Judge Brieant on March 21, 1989.

Before the court decided Novod's motion, the grand jury found a twenty-seven-count superseding indictment against Novod on April 19.[1] Count One alleged a conspiracy to defraud the United States in violation of 18 U.S.C. § 371; Counts Two through Ten alleged mail fraud in violation of 18 U.S.C. §§ 1341 and 1342; Counts Eleven through Seventeen alleged wire fraud in violation of 18 U.S.C. §§ 1343 and 1342; and Counts Eighteen through Twenty–Seven alleged perjury in violation of 18 U.S.C. § 1623. Paragraph Two of both the mail and the wire fraud counts stated that the scheme had three objectives: (a) "to obtain, in the name of 'Disposal Enterprise Corporation,' a permit from [NYSDEC], which would have been of substantial value to Novod and others to the Grand Jury known and unknown"; (b) "to defraud New York State and residents of Montgomery, New York

---

1. Sacco and Armento pleaded guilty to several of the counts in the first indictment.

and other nearby areas of money and property including, among other things, funds necessary to cover, treat, clean up, and remove material from, a dumpsite in Montgomery, New York, and funds required to litigate for closure of and payment of clean-up and related costs with regard to said dumpsite"; and (c) "to defraud the United States, New Jersey, and New York of taxes." Novod pleaded not guilty, and on July 14 moved to dismiss, making the same argument on the fraud counts as in his earlier motion.

In an August 25 memorandum and order, Chief Judge Brieant dismissed two of the perjury counts but denied the motion as to the others. Addressing Novod's argument on the fraud counts, the court concluded that the indictment alleged that the scheme sought to obtain sufficiently tangible property to satisfy *McNally.*

At trial, pursuant to Fed.R.Crim.P. 29, Novod moved for a judgment of acquittal on the fraud counts on the same grounds already argued. After a colloquy, Judge Broderick, to whom the case had been assigned for trial, denied the motion, stating that he would instruct the jury "that the government must prove beyond a reasonable doubt that it was the purpose of the scheme to obtain the permit through false pretenses and that as a matter of law the permit constitutes property."

Novod raises four substantive challenges to his conviction: first, that the object of the alleged conspiracy was not "property" under the fraud statutes; second, that evidence was erroneously admitted evidence relating to his co-conspirators' past environmental violations; third, that he was denied a fair trial; and fourth, that the impaneling of a juror who resided outside the Southern District violated his sixth amendment rights.

### I.

■ Novod contends that the district court erred by instructing the jury that it could convict solely on a finding that the scheme sought to obtain the dumping permit and by not requiring a finding that the scheme sought to cause a pecuniary loss to the State. The author of this opinion and Judge Winter disagree, but nevertheless reverse Novod's conviction as to the mail and wire fraud counts because we feel bound by *United States v. Schwartz,* 924 F.2d 410, 416–18 (2nd Cir.1991), which held that a permit to export goods was not "property" within the meaning of the §§ 1341 and 1343. The ensuing discussion sets forth the view of the author and Judge Winter that a permit to operate a waste dumpsite constitutes "money or property" under the federal mail and wire fraud statutes. Because of the disagreement of a majority of this court with the construction of the mail and wire fraud statutes in *Schwartz,* this opinion and the *Schwartz* opinion were circulated to the judges of this circuit for the purpose of deciding whether the issue should be resolved *en banc.* After circulation, the judges determined that the issue did not merit *en banc* review.

The mail fraud statute prohibits, in pertinent part, the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341.[2] In *McNally v. United States,* 483 U.S. 350, 356, 107 S.Ct. 2875, 2879 (1987), the Supreme Court held that the terms "money or property" do not include "the intangible right of the citizenry to good government." Noting the scant legislative history explaining the statute and the ambiguity of the statute itself, the Court opted for a narrow reading. "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for state and local officials," the Court stated, "we read § 1341 as limited in

---

**2.** The wire fraud statute, 18 U.S.C. § 1343, is substantively identical to the mail fraud statute in all relevant respects, including the "money or property" requirement. Both statutes are construed identically. *See United States v. Covino,* 837 F.2d 65, 71 (2d Cir.1988).

scope to the protection of property rights." *Id.* at 360, 107 S.Ct. at 2882.[3]

Clarifying that holding the next term in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court held that a scheme to purloin confidential information from *The Wall Street Journal* was properly prosecuted under the mail and wire fraud statutes. The "intangible nature" of the information did not "make it any less 'property' protected by the mail and wire fraud statutes," the Court reasoned, and it concluded, *"McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* at 25, 108 S.Ct. at 320. *McNally* and *Carpenter* taken together establish that "property" under the statutes encompasses things, however intangible, that are currently of value to their owners. But the cases say nothing about schemes to defraud a state government into granting a discretionary permit. In *United States v. Evans*, 844 F.2d 36 (2d Cir.1988), we addressed a scheme to deceive the United States about the true destination of arms sold to a foreign nation. The defendants, hoping to obtain the necessary government approval for the arms transfer, allegedly sought to conceal the fact that the arms were destined for Iran. According to the mail and wire fraud counts of the indictment, the "property" the scheme sought to be obtained comprised the arms themselves and the commissions from their sale. *Id.* at 37. Evans contended in part that the property must belong to the deceived party, here the United States. We did not reach this question because, citing *McNally*'s requirement that "any benefit which the Government derives from the statute[s] must be limited to the Government's interests as property holder," 483 U.S. at 359 n. 8, 107 S.Ct. at 2881 n. 8, we concluded that "the government must show that it had some property interest in the arms," 844 F.2d at 40. We then rejected the Government's contention that it had a property interest by virtue of its ability to control the transfer of the arms

to foreign states. *Id.* at 40–42. The interest of the Government, which neither manufactured nor owned the weapons, was only "ancillary to a regulation, not to property." *Id.* at 42. *See also Corcoran v. American Plan Corp.*, 886 F.2d 16, 20–21 (2d Cir.1989) (New York State, as regulator, has no property interest in money stolen from private insurance companies).

Novod argues that NYSDEC's interest in the dumping permit, which it issues in an effort to control environmental waste, is similarly "ancillary to regulation." We believe, however, that the permit satisfies the requisites of "property" under the statutes. Unlike in *Evans* and *Corcoran*, Novod and his co-conspirators sought to obtain something tangible from the State. The defendants in those cases sought arms for international sale and insurance monies, and although the Government strictly regulated those fields, the property fraudulently obtained did not belong to the Government. Rather, the property belonged to private parties; the Government's interest was solely in controlling the *use* of the property by those private parties and by others. In contrast, the dumping permit originates with NYSDEC; the decision whether to grant it to an applicant rests solely with the agency. By submitting to that application procedure, moreover, the applicant implies that it wants something that only NYSDEC has and can give. Without the agency's assent, the permit remains with the agency. The process is tantamount to a contractual transaction where a buyer and seller agree on a mutually satisfactory exchange of consideration. Here, NYSDEC's offer to "sell" the permit to Novod and his co-conspirators was contingent on its first extracting from the "buyers" certain promises affecting how the permit would be used. The bargained-for exchange, in essence, would have been permit for promise.

Thus construed, the permit constitutes property within the reach of the fraud statutes. Novod would have us believe that

---

**3.** In the wake of *McNally,* Congress in 1988 enacted 18 U.S.C. § 1346, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." This provision is not applicable here.

because the State does not buy and sell the permits, and likewise does not seek a profit from their issue, it suffers no loss when it is defrauded into granting them. Although the property lost by the State is not pecuniary, it is akin to what the *Journal* lost in *Carpenter:* the right to control a substantial "asset" central to its organizational mission. The defendants' scheme in *Carpenter* deprived the *Journal* not of any quantifiable sales revenue or profits, but of the exclusive use of the information gathered for its "Heard on the Street" column. As the *Journal* is in the business, in part, of conveying that information to its readers, so too is NYSDEC in the "business" of conveying regulatory permits to responsible dumpsite operators. Novod's scheme, had it succeeded, would have deprived NYSDEC of the property essential to its performing that function.[4] Any other conclusion would be contrary to *McNally's* holding that a government is to be treated like any other property-holding victim under the fraud statutes.

In reaching this conclusion, we reject Novod's implicit contention that a government has no property interest in the various forms of largess it bestows. The recipient of such largess has an undeniable property interest, *see, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); the state's interest prior to conferring it is equally compelling. In *United States v. Turoff,* 701 F.Supp. 981 (E.D.N.Y. 1988), for example, the court held that New York City taxi medallions—licenses to operate taxicabs in the City—were "property" under the fraud statutes. Responding to the assertion that the medallions, as a form of public licensure, had no value in the government's hands, the court stated:

> The sovereign can buy and sell and manufacture and derive proceeds ... only by virtue of the power it possesses as sovereign—namely its police power, its power to tax, etc.... To rob the sovereign of

the due exercise of that power by schemes or artifices to defraud, is to rob it of "property" as surely as the goods or chattels or money obtained from a private person by similar schemes or artifices.

*Id.* at 989. As the court noted, the fact that certain rights—there, the right to operate a taxicab; here, the right to operate a dumpsite—become vested in the licensee upon conveyance by the government does not prevent the corollary conclusion that the license "originate[s] in the state" and is public property prior to being granted to a private party. *Id.* at 990; *see also United States v. Martinez,* 905 F.2d 709, 712–715 (3d Cir.1990); *United States v. Paccione,* 738 F.Supp. 691 (S.D.N.Y.1990). *See generally* Reich, *The New Property,* 73 Yale L.J. 733 (1964).

We realize that our decision is at odds with the law in several other circuits, *see, e.g., United States v. Granberry,* 908 F.2d 278, 280 (8th Cir.1990) (school bus operator permit is not "property" under the wire or fraud statutes); *United States v. Kato,* 878 F.2d 267, 268–69 (9th Cir.1989) (federal pilot licenses not property before government issuance); *Toulabi v. United States,* 875 F.2d 122, 125 (7th Cir.1989) (taxi drivers' license, in city government's hands, "is a promise not to interfere rather than a sliver of property"); *United States v. Murphy,* 836 F.2d 248, 254 (6th Cir.) ("unissued certificate of registration [to conduct bingo games] is not property of the State of Tennessee"), *cert. denied,* 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988); *but see United States v. Martinez,* 905 F.2d 709, 713–15 (3d Cir.1990) (state issued license to practice medicine held to constitute "property"). In our view, the contrary decisions misconstrue *McNally* and its repudiation of the "intangible rights" doctrine. Prior to that case, prosecutors regularly used the fraud statutes to combat

---

**4.** We do not address the Government's contention that Novod's scheme, by potentially depriving the state of cleanup costs and tax revenues, thereby satisfied the property requirement. Judge Broderick refused to charge the jury on these theories of property, listed as theories (b) and (c) in the superseding indictment. Conse-

quently we have no occasion to decide whether, had Novod been convicted on the basis of either of those theories, the convictions would have been proper as a matter of law. Our decision is limited to the question of whether the instruction the district court did give—the permit-as-property theory—was proper.

corrupt activities aimed at depriving citizens of their intangible right to honest governmental services. *See* 483 U.S. at 358, 107 S.Ct. at 2881; *id.* at 362–63 n. 1, 107 S.Ct. at 2882–83 n. 1 (Stevens, J., dissenting). Similarly, *McNally* involved a public official whose corrupt acts effectively denied the citizenry the honest service it had a right to expect. The case established that such intangible rights were not within Congress's conception of "money or property" as articulated in the statutes. Rather, the statutes embodied the "common understanding" of fraud and property, 483 U.S. at 359, 107 S.Ct. at 2881—that is, " 'the deprivation of *something of value* by trick, deceit, chicane or overreaching,' " *id.* at 358, 107 S.Ct. at 2881 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)) (emphasis added). The Court thus reasoned that the statutes do not reach schemes to deprive the general public of honest government precisely because the "common understanding" of "property" does not encompass vague notions of public service. However, it is quite another thing to use that reasoning, as other courts have, to hold that the statutes do not encompass schemes by private individuals to obtain a valuable license from a government agency. Had the present facts involved NYSDEC officials' corruptly denying defendants the permit they deserved, or corruptly acting in concert with them to grant the license, this case would have been nearly identical to *McNally*. The facts here are substantially different: Novod's scheme was plainly aimed at obtaining "something of value" from the State by deceptive means. Because the perpetrators used the mails and the wires in furtherance of that scheme, their acts should fall within the prohibition of the federal fraud statutes.

## II.

Novod contends that the district court erroneously allowed Ferry, the NYSDEC attorney and a central Government witness, to testify to Sacco's and Armento's prior violations of environmental law. Specifically, he objects to her testimony that in 1987 and 1988, NYSDEC forced Sacco to cease operations at several dumpsites in New York because of violations and that the cleanup of the Tuxedo site would cost $4.5 million. Novod objected to the testimony, arguing that it created a "prejudicial atmosphere of guilt by innuendo." The objections were overruled. We agree with the Government that the court's rulings were proper.

First, insofar as other evidence demonstrated Novod's awareness of the prior violations, Ferry's testimony established his motive for helping Sacco and Armento obtain the permit surreptitiously. During Armento's testimony, for example, the following exchange took place:

Q.   Did you have a conversation with the defendant about the [Montgomery, New York] site?

A.   Yes, I did mention it to him.

Q.   When was that?

A.   That was sometime shortly after the other sites had been closed down, and I guess it was early April.

Q.   What did you tell him?

A.   I told him that I had this site, and [Sacco] and I were looking to purchase it; . . . and that we were having a little bit of a problem getting the permit transferred. . . .

Q.   Did you tell him what your problem was?

A.   Well, I told him that the problem was going to be if [NYSDEC] knew that either myself or Frank Sacco were involved . . . the permit wouldn't be issued to us . . . because we had both by this time been blackballed by [NYSDEC].

Other testimony revealed that Novod had represented Sacco and Armento in matters relating to several of the dumpsites closed by NYSDEC because of those prior violations. Additionally, Ferry testified that she informed Novod that Sacco and Armento had operated certain dumpsites that "had to be closed for violations" and that any involvement by them with the present application could cause it to be disapproved.

This evidence bore on Novod's motive for providing assistance to Sacco and Armento and was directly relevant to his role in the covert effort to gain the permit for the Montgomery dumpsite and to his perjury before the grand jury. As such, that evidence provided the background for Ferry's statements—the testimony to which Novod objected—which established initially the fact of Sacco and Armento's prior violations. As we noted recently in a similar case:

> "[E]vidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity," as long as it is "relevant to some disputed issue in the trial" and satisfies the probative-prejudice balancing test of Fed.R.Evid. 403.... "Other crimes" evidence may be admitted to complete the story of the crimes charged.

*United States v. Diaz,* 878 F.2d 608, 615 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989) (citations omitted). Moreover, where such evidence concerns the prior acts of co-conspirators, there is little danger of the prejudice envisioned by Rule 404(b), which generally bars such evidence as it pertains to a defendant's own prior acts. *Id.* at 616; 22 C. Wright & K. Graham, Federal Practice and Procedure § 5239 (1978 & Supp.1990). A balancing test to discern possible prejudice was therefore unnecessary.

Second, Ferry's testimony was admissible for the additional purpose of proving that New York would have suffered a pecuniary loss had DEC been granted the permit. As noted, the superseding indictment alleged three possible theories of "property" of which the conspirators sought to defraud the State, one of which was the clean-up costs and litigation expenses incident to the operation of the dumpsite. By seeking admission of the disputed evidence, the Government sought to prove that Sacco and Armento had previously operated such dumps unlawfully and that they would cause the State to incur the alleged costs were they to operate the Montgomery dump in a similar fashion. Although we agree with Novod that the Government's proof of this contention was insufficient, we nonetheless find that the admission of the testimony, as the Government attempted to make sufficient proof, was proper. At the time, the court had not yet decided not to charge the jury on this theory. The court did not inform the parties that it would so charge until its ruling on Novod's Rule 29 motion, made at the close of the Government's case.

Third, we do not believe Novod was prejudiced by admission of the disputed evidence. He argues that the testimony was "inflammatory" and "highly prejudicial" but does not convincingly demonstrate how. The evidence was relevant to show the nature and background of the activities of the conspiracy. Further, the district court was careful to strike testimony involving Sacco's other prior misdeeds that were clearly of no relevance to Novod, such as his failure to file tax returns.

Still, as Novod contends, not all of the admitted testimony concerned environmental violations of which Novod was directly aware; much of it related to his general awareness of Sacco and Armento's prior violations but did not indicate that he was aware of the specific dumpsites for which they were cited. Evidence about specific events that Novod knew nothing about is of questionable relevance to Novod's motivation either for participating in the scheme to obtain the permit fraudulently or for covering up his clients' ties to DEC before the grand jury. Nonetheless, we are satisfied that the court did not abuse its wide discretion in allowing the testimony. " '[D]eterminations of relevance are entrusted to the sound discretion of the trial judge, and his decision will not be overturned unless he has acted arbitrarily or irrationally.' " *Diaz,* 878 F.2d at 614 (citations omitted). And although the court did not give a limiting instruction, the record indicates that Novod did not seek one, despite his previous objections to the testimony. "The established rule is that if a party objects but does not request a limiting instruction, he cannot complain of failure to give the instruction on review." 21 C. Wright & K. Graham, Federal Prac-

tice and Procedure § 5036 (1977) (footnote omitted).[5] In view of the substantial relevant evidence of Novod's knowledge of the dumpsite operations of Sacco and Armento, the reception of this evidence does not warrant a new trial.

### III.

In response to questioning during *voir dire*, one potential juror stated that she resided in Ulster County, which, until 1978, had been in the Southern District but since then has been part of the Northern District.[6] Neither party objected to her service, and she was impaneled and served as a juror. At the close of trial, after Judge Broderick had completed most of his jury instructions, a Government case agent informed the court during a colloquy that Ulster County was outside the Southern District. Although the colloquy dealt with the venue of the defendant's criminal acts, not with the jurors' residences, neither party objected to the juror's impanelment or requested that she be disqualified from participating in deliberations. Following the verdict, however, Novod moved for a new trial, contending that the impanelment of the juror violated his sixth amendment right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed." The court, noting that Novod failed to make a timely objection before the jury commenced its deliberations, denied the motion.

Novod now contends that his failure to object was not a knowing and voluntary waiver of his constitutional right because his trial counsel did not realize the true boundaries of the Southern District. We agree with the district court's conclusion that the right to challenge the juror was waived. Novod did not object when the juror first identified her county of residence; nor did he do so once he became aware of the actual boundaries of the Southern District during the colloquy. Had timely objection been made prior to the jury's deliberations, the court could have substituted an alternate juror. There is no claim that the juror was not otherwise qualified to serve. Absent some such showing of prejudice, the failure of Novod's counsel to recognize the residence issue and make a timely objection prevents Novod from raising the issue after trial and a jury verdict. *See generally Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); *United States v. Levasseur,* 816 F.2d 37, 45 (2d Cir.1987).

### IV.

Novod's contentions that he was denied a fair trial because the Government filed the superseding indictment solely to defeat his pending motion to dismiss, and that Judge Broderick violated the law of the case by disregarding a prior ruling of Chief Judge Brieant concerning that essential element do not merit discussion.

The mail and wire fraud counts are reversed, and the perjury and conspiracy counts are affirmed.

FEINBERG, Circuit Judge, concurring:

I join in the majority's opinion except for Part I, in which the majority explains why it disagrees with this court's decision in *United States v. Schwartz,* 924 F.2d 410. As to Part I, I concur only in the result; unlike the majority, I agree with the analysis in *Schwartz* of 18 U.S.C. §§ 1341, 1343.

---

**5.** We are unpersuaded by the Government's argument that Novod's objection to this evidence must fail because his counsel elicited similar testimony on cross-examination. As Novod points out, the evidence of Sacco and Armento's prior violations was admitted over defense objections, and once the objections were overruled and the jury heard that testimony, defense counsel had no choice but to attempt to limit its effectiveness by pursuing the objected-to topics on cross-examination.

**6.** Apparently the jury summons was sent to the juror's old address inside the Southern District and was forwarded to her new address in Ulster County.