UNITED STATES of America, Appellee,

v.

Arthur MITTELSTAEDT and John Johnsen, Defendants–Appellants.

Nos. 1435, 1797, Dockets 93–1645, 93–1713.

United States Court of Appeals, Second Circuit.

Argued May 11, 1994.

Decided Aug. 10, 1994.

Marvin Zevin, Mineola, NY (Paula Schwartz, Frome, Yanelli, Zevin & Civardi, Mineola, NY, of counsel), for defendant-appellant Arthur Mittelstaedt.

Judd Burstein, New York City (Kim P. Bonstrom, Marc Fernich, of counsel), for defendant-appellant John Johnsen.

David James, Asst. U.S. Atty. E.D.N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Peter A. Norling, Asst. U.S. Atty., Faith E. Gay, Sp. Asst. U.S. Atty., Office of U.S. Atty. E.D.N.Y., of counsel), for appellee.

Before: NEWMAN, Chief Judge, JACOBS, and LEVAL, Circuit Judges.

JACOBS, Circuit Judge:

Defendant John Johnsen served as the consulting engineer for two Long Island communities, and abused his influence with local government on zoning and planning matters by engaging in real estate projects there, using partners to conceal his participation. Johnsen and one of his confederates, Arthur Mittelstaedt, appeal from their convictions in the United States District Court for the Eastern District of New York for conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and for filing false income tax returns, in violation of 26 U.S.C. § 7206. Johnsen also was convicted of eight substantive counts of mail fraud, in violation of 18 U.S.C. § 1341, and appeals from five of these.

Johnsen argues on appeal that the trial court erred in refusing to give a "missing witness" charge and that five of the substantive mail fraud counts must be reversed because the district court failed to charge the jury that, under the mail fraud statute, concealed information is only material if it has an impact on the value of the transaction. Mittelstaedt argues, *inter alia,* that his conduct did not constitute mail fraud depriving

the towns of "money or property" because, at the time of the acts charged, the "honest services" of a government employee was not "money or property" within the meaning of the mail fraud statute. He also contests his conviction on the false tax return counts. We agree that Johnsen's convictions for substantive mail fraud, under counts four through eight of the indictment, must be reversed; we also agree that Mittelstaedt's conviction for conspiracy to commit mail fraud must be reversed; and we affirm in all other respects.

## Background

The charges in this case all arise from Johnsen's position in the 1980s as a consulting engineer to the Town of Southampton and to the Village of Westhampton Beach, both in New York State. In that role, Johnsen made reports and recommendations regarding the construction of public works projects and the creation of land subdivisions, prepared contract specifications and reviewed bids for public improvements contracts, conducted inspections to ensure satisfactory completion of public contracts, and generally provided advice on a range of public engineering matters. Johnsen's position gave him the opportunity—which he exploited—to misappropriate information, and to influence planning boards improperly in respect of projects in which he had a secret interest.

This appeal concerns four development projects. In chronological order of their inception, they are: 271 Flanders Road in Southampton; 11 Glovers Lane in Westhampton Beach; Hampton Park in Southampton; and 10–12 Glovers Lane in Westhampton Beach. The transactions involved slightly different sets of confederates, including Mittelstaedt, Harry Tew, and Edward Broidy (who testified at trial under a grant of immunity); and transpired over a period of years. During that time, the mail fraud and wire fraud statutes were amended in a way that has a bearing on this appeal. On June 24, 1987, the Supreme Court held in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), that the federal mail fraud statute, 18 U.S.C. § 1341, did not

prohibit schemes to deprive citizens of their intangible right to honest government. On November 18, 1988, Congress amended the mail and wire fraud statutes to cover schemes to deprive others of "the intangible right of honest services." 18 U.S.C. § 1346. The outcome of this appeal in part turns on the facts of the four transactions and the timing of the transactions in relation to the statutory amendment.

## A. 271 Flanders Road

In the late 1970s, Johnsen became acquainted with Edward Broidy, a local contractor and developer who occasionally constructed sidewalks and curbs for Southampton. As consulting engineer to the town, Johnsen established the specifications for the public projects on which Broidy bid, and assisted Broidy in processing the paperwork. Through this association, the two became close friends.

In the early 1980s, Johnsen and Broidy conceived a plan to build a sports facility in Southampton that would accommodate ice skating, basketball, and the circus. Broidy introduced Johnsen to Arthur Mittelstaedt, a landscape architect in the firm of Ward Associates, whom Broidy had known for decades. After several meetings, Mittelstaedt joined the venture with Broidy and Johnsen. These three agreed that Broidy would front as the developer, that the ownership interests of Johnsen and Mittelstaedt would be concealed, that Johnsen would locate a suitable parcel of land and facilitate matters that came before the town planning board, and that Mittelstaedt would produce architectural drawings and make presentations to the town, holding himself out as an impartial expert recommending approval.

Johnsen located a drive-in theater in Southampton as a site for the project. The property was in the shape of a "T," with the base on Flanders Road. In order to have sufficient frontage, it was thought necessary to acquire adjacent Flanders Road properties on either side of the drive-in. Before any attempt was made to purchase property, Mittelstaedt wrote a letter to Southampton on the letterhead of "Peconic Sports, Inc.," a fictitious corporation. The letter, which re-

flects an evident change in what was originally intended to be Mittelstaedt's role as an impartial expert, requested a meeting with the planning board to discuss the proposed complex. He subsequently made a presentation to the board, and the board unanimously approved the project in October 1982.

Broidy and Johnsen then met with the drive-in's owner, United Artists, to negotiate the purchase of the drive-in, with Johnsen ostensibly acting as an advocate for the town's interests. United Artists wanted far more money than the partners were willing to pay, but it proposed that it might be willing to let the land go to Broidy for little or nothing if it could obtain a zoning variance for a multiplex theater that it wanted to build at another location. Though Johnsen rejected this proposal at the meeting, he told Broidy to call the company's president and inform him that they might be able to help him with the town's architectural review board.

While those discussions continued, Broidy negotiated for the purchase of the adjacent properties. He managed to obtain an option for one, but the owner of 271 Flanders Road insisted on an outright sale for $45,000, with $2,000 down, another $2,000 on closing, and assumption of two mortgages on the land. Broidy agreed in September 1982, and paid the $4,000 cash out of his own funds. Johnsen and Mittelstaedt each contributed funds to equalize their investments with that of Broidy, and Mittelstaedt deposited this money in a partnership bank account Mittelstaedt opened in the name of "JA & E" (the first-name initials of the partners).

Mittelstaedt then wrote a letter to the town, recommending that it join Broidy in the purchase of the drive-in. Soon after, however, negotiations with United Artists broke down, the deal fell through, and the partners placed a "for sale" sign on the property at 271 Flanders Road. In response, Broidy received a call from Paul Council, director of community development for the town, who expressed an interest in acquiring the property for use as a child care center.

Nothing in the record supports an inference that any member of the partnership inspired the bid that the town ultimately made. The town obtained two independent appraisals, which determined that a fair market price for the land was $108,000. Council then relayed this offer to Broidy, at the same time demanding a $10,000 kickback for putting the deal together. Because the partners had planned to ask $90,000 for the property, they decided to pay the bribe. Broidy funded the kickback, and Johnsen and Mittelstaedt each contributed money into the JA & E account to once again equalize their investments.

Southampton purchased 271 Flanders Road in August 1984. The proceeds were deposited directly into the JA & E account.

### B. 11 Glovers Lane

Late in 1984, Broidy found a house for sale at 11 Glovers Lane in Westhampton Beach that he believed would be a good location for retail stores. He discussed this prospect with Johnsen and Mittelstaedt, who agreed to join the venture as equal partners. The partnership kept Johnsen's interest a secret, because his advice would be sought by the board on an anticipated zoning re-classification.

The property was deeded to Broidy and Mittelstaedt on May 14, 1985, with the $11,800 downpayment drawn from the JA & E bank account. Approval was sought from the Westhampton Beach planning board for conversion of the property to commercial space. In support of the application, Broidy submitted plans that had been drawn up by a surveyor named Ed Bullock, with whom Johnsen had previously worked.

The planning board met several times to consider the proposal for 11 Glovers Lane. At each meeting, Broidy would present the plans, and the members of the board would comment and raise objections. Johnsen was always present in his capacity as advisor to the board, never disclosing his ownership interest in this parcel of land. After each board meeting, Johnsen and Broidy would repair to Bullock's office to correct the plans in response to the board's objections. After six or seven repetitions of this process, the board approved the plans.

One regulatory issue affecting 11 Glovers Lane was the board's concern that parking

was inadequate. Village regulations required parking lots to have aisle widths of at least 24 feet. However, in order to increase the number of spaces (as the board wanted) without reducing the commercial footage, Johnsen instructed Bullock to prepare plans with aisle widths of less than 24 feet. The village planning board approved the project, relying on Johnsen's expertise, without being told that the parking aisles did not conform to code.

After approval, the partnership sought a building permit. Because they had not yet secured construction financing, Broidy delayed picking up the permit. In the interim, the village building inspector died, and the new inspector discovered that the parking aisles were non-conforming. He told Broidy that no building permit would be issued until the matter was resolved. The partners took no further action, instead transferring the property to JA & E Construction, Inc. (the successor to the JA & E partnership) some time in 1986 or 1987.

## C. Hampton Park

Broidy received a call from a broker in 1986 marketing a 72 acre parcel of land in Southampton. The property included some land located in a so-called "old file map" area, which meant that it was subject to strict limitations on development. Broidy spoke to Johnsen about the property, and they agreed to invest as equal partners. Mittelstaedt was excluded from this deal because they had no need for his money or expertise. The partners planned to obtain approval to subdivide the property, develop it, and then sell the parcels to builders. Johnsen made the $20,-000 downpayment with a check drawn by his friend (and co-defendant) Harry Tew.

After contracting to purchase the property, Johnsen and Broidy retained Bullock to draw up a plan that subdivided a portion of the site into four lots. Southampton rejected the initial plan. Broidy subsequently informed Johnsen that he did not want to go ahead with the closing, and Johnsen got Tew and another friend to agree to buy out Broidy's rights for $100,000. The three new partners then closed on the property, and the project proceeded without Broidy.

The Westhampton Beach planning board, relying heavily on Johnsen's expertise as town engineer, approved a proposed development plan for this property in August 1988. This development plan—now known as Hampton Park—had a serious flaw: it illegally transferred development rights from a parcel of land outside the old file map area to a parcel located within the protected old file map area, in order to increase the number of buildable lots on the Hampton Park property. Although town regulations required that such a transfer of development rights be approved by the Town Board (an entity separate from the planning board), evidence at trial demonstrated a likelihood that the transfer was effected by Johnsen simply altering the official map of the area.

During this time, neither Johnsen's ownership interest nor his involvement in the creation of development plans was disclosed to the planning board. In or about January 1990, development was suspended when a toxic waste dump was discovered on the property.

## D. 10–12 Glovers Lane

It was public knowledge in Westhampton Beach, in or about March of 1988, that the village was considering adding downtown parking areas, but all specifics were closely guarded. The meetings of the board of trustees on that subject were held in closed session, and all in attendance were instructed that any information as to parking plans was to be kept confidential. Johnsen was of course privy to these plans, and informed Broidy, giving him a map surreptitiously obtained from the planning board that showed the area under consideration.

Johnsen and Broidy agreed to buy property within the designated area, with the intention of reselling the land to the village. Once again, they decided that they did not need Mittelstaedt's participation and agreed that it would be an equal partnership venture between the two of them.

Broidy learned that 10–12 Glovers Lane (one of the parcels noted on the map) was being offered for sale by the executrix of an estate. Broidy wrote to her on April 6,

indicating his interest and his willingness to close quickly. After some negotiations Broidy and Johnsen's friend Ben Kasper purchased the property for $185,000 on May 25, 1988. A reasonable inference from the evidence is that Kasper was fronting for Johnsen.

After the closing, Broidy began negotiations with the village mayor over the resale of the property. As a ruse to pressure the village into a quick deal, Broidy applied to the village planning board for a permit to develop the property. Johnsen gave Broidy plans for the construction of stores on the land, which Broidy took to an engineer for approval and then submitted to the planning board. The government is entitled to the inference that Broidy and Johnsen never intended to build anything, but only wanted to raise the stakes.

Broidy appeared at several meetings of the planning board, which Johnsen also attended in his role as village engineer (without disclosing his ownership interest). The mayor testified at trial that in 1988 or 1989 he asked Johnsen whether he ought to be concerned about Johnsen's relationship with Broidy, to which Johnsen responded in the negative. Ultimately, the village agreed to purchase the property for $262,000. This agreement was short lived, however, because public outcry over the purchase price forced the village to back out of the deal.

### E. Incorporation of JA & E

In September 1987, the JA & E partnership was dissolved and all its assets were transferred to a new entity, JA & E Construction Corporation. The three stockholders of that entity were Broidy, Mittelstaedt and Harry Tew—who, the evidence indicates, was acting as Johnsen's nominee as part of the ongoing concealment of Johnsen's interests. 11 Glovers Lane continues to be owned by JA & E.

### F. Tax Filings

Mittelstaedt signed the tax returns for 1985, 1986 and 1987 on behalf of the partnership. Those returns listed Broidy and Mittelstaedt as the sole partners, and thereby concealed Johnsen's interest. Johnsen's personal income tax returns likewise failed to disclose his interest in the partnership, and failed to report income from the transactions in which the partnership was involved.

### G. The Indictment

A superseding indictment was filed on September 24, 1992, containing 26 counts. Count one charged Johnsen, Mittelstaedt and Tew with conspiracy to commit mail fraud against Southampton and Westhampton Beach in violation of 18 U.S.C. § 371. Counts two and three charged Johnsen and Tew with mail fraud against Southampton with respect to the Hampton Park project. Counts four through ten charged Johnsen with mail fraud against Westhampton Beach with respect to 10–12 Glovers Lane. Counts eleven through thirteen charged Mittelstaedt with filing false partnership income tax returns, in violation of 18 U.S.C. § 3623 and 26 U.S.C. § 7206(1). Counts fourteen through sixteen charged Johnsen with aiding and assisting in the preparation of false partnership tax returns, in violation of 26 U.S.C. § 7206(2), and counts seventeen through nineteen charged him with filing false personal income tax returns, in violation of 26 U.S.C. § 7206(1). The remaining counts involved only Harry Tew and his spouse, and are not a subject of this appeal.

Following a four-week jury trial, Mittelstaedt was convicted on the conspiracy count and on the tax counts, and was sentenced to six months of imprisonment, two years of supervised release, a $10,000 fine and a $200 special assessment. Johnsen was convicted of the conspiracy count, substantive counts concerning Hampton Park (two and three) and 10–12 Glovers Lane (counts four through eight and ten), and the partnership tax counts (fourteen through sixteen); and was sentenced to twenty-one months of imprisonment, two years of supervised release, a $10,000 fine and a $600 special assessment.

### Discussion

### I. Johnsen

Johnsen raises two arguments on appeal. First, he challenges the district court's refusal to give a "missing witness" charge to the

jury. Second, he argues that his conviction on counts four through eight must be reversed because the court gave an erroneous jury instruction.

## A. "Missing Witness" Charge

■ Johnsen argues that the district court abused its discretion by failing to give a missing witness charge regarding Ed Broidy's wife, Pat Broidy. Mrs. Broidy acted as Ed Broidy's bookkeeper, preparing the various ledgers that recorded his real estate investment activity. An entry in one of those ledgers, for May 21, 1987, was introduced at trial to corroborate Broidy's testimony regarding the buy-out of his interest in the Hampton Park transaction. This entry reflected the receipt of $50,000 and contained the penciled notation: "May 21 refund loan ... John, Harry Tew."

At trial, the government offered this ledger entry into evidence as a business record under Fed.R.Evid. 803(6). Johnsen's attorney conducted a voir· dire challenging the authenticity and source of this entry, which Broidy testified was in his wife's handwriting. When questioned as to his wife's whereabouts, Broidy responded that he believed his wife had just left for a trip to Florida. Johnsen's counsel then objected to the admission of the ledger, arguing that Mrs. Broidy should be called as a witness to authenticate the document. After a side-bar, the district court overruled this objection and admitted the ledger. Johnsen's counsel later conceded the propriety of the court's ruling, and on appeal does not contest the admissibility of the ledger.

■ During the charging conference, defense counsel requested a missing witness charge with respect to Mrs. Broidy. The district court denied the request on the ground that the witness was not under the government's control. Johnsen argues that a missing witness charge should be given not only where the witness is under the actual control of the government, but also where the witness, due to her relationship to the prosecution, is not "equally available" to the defense. He contends that because this is such a case, the court erred in refusing to give the requested charge. There is no indication that Johnsen's counsel proposed any specific charge to the trial court on this point. Since "appellant[ ] apparently did not submit proposed language for [his] requested charge, ... we cannot determine whether the requested charge would have accurately reflected the law." *United States v. Torres*, 845 F.2d 1165, 1171 (2d Cir.1988). Johnsen's position on appeal is therefore somewhat impaired, since he has the burden on appeal to "show that the requested charge accurately reflected the law and that, viewing the charge actually given as a whole, he was prejudiced." *Id.*

■ In any event, "[w]hether a missing witness charge should be given lies in the sound discretion of the trial court." *Torres*, 845 F.2d at 1170–71. An appellate court should bear " 'a well deserved reluctance to remove the issue from the sound discretion of the trial judge,' in part because of 'the usual aura of gamesmanship' that frequently accompanies requests for a missing witness charge as to which the trial judge will have a surer sense than the appellate court." *Id.* at 1171 (quoting *United States v. Erb*, 543 F.2d 438, 445 (2d Cir.1976)).

■ Although the district judge refused to give the requested instruction, Johnsen's attorney was permitted to emphasize Mrs. Broidy's absence from trial in his closing remarks to the jury. On appeal, "the reviewing court" ought to be "reluctant to reverse 'where a judge refrains from commenting on the inference to be drawn on the facts before the jury and allows counsel instead to argue the inference.' " *United States v. Saa*, 859 F.2d 1067, 1076 (2d Cir.1988) (quoting *Torres*, 845 F.2d at 1171), *cert. denied*, 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989). We agree with Johnsen that an attorney's closing argument does not bring to bear the same force as would a pronouncement on the issue from the bench; but that does not in itself support an inference of prejudice—a requisite element of this challenge. *See Torres*, 845 F.2d at 1171 (citing *United States v. Ouimette*, 798 F.2d 47, 49 (2d Cir.1986)).

■ We reject Johnsen's argument that Mrs. Broidy was—as a matter of law—un-

**1216**

available to the defense. True, Mrs. Broidy was given immunity from prosecution, and she well might have been favorably disposed to the government. But the defense never approached her to give testimony. She is therefore not like the witnesses in *Torres* and *Saa*, who refused to testify. While her mid-trial departure for Florida was seemingly abrupt, she left before the defense raised any question of her being called to testify. The prosecution, having never interviewed her, cannot be said to know what testimony she might have given had she been called.

 A missing witness charge inviting the jury to infer that the testimony of an uncalled witness might have favored a specified party "is appropriate if production of that witness is 'peculiarly within [the] power' of the other party." *United States v. Nichols*, 912 F.2d 598, 601 (2d Cir.1990) (quoting *Torres*, 845 F.2d at 1169). Even taking into consideration "all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility," *Torres*, 845 F.2d at 1170 (internal quotations and citation omitted), we cannot say that Mrs. Broidy was "peculiarly within the power" of the government. The district court did not abuse its discretion in refusing to give a missing witness charge to the jury.

**B. Jury Instruction on "Right to Control"**

Counts four through ten of the indictment are substantive mail fraud counts concerning Johnsen's participation in a scheme to defraud Westhampton Beach with respect to the attempted sale of 10–12 Glovers Lane. Specifically, the indictment charges that the scheme concealed Johnsen's ownership interest in that property, with the objectives of depriving Westhampton Beach of "Johnsen's honest services ... the right to material information concerning the expenditure of public monies ... [and] confidential business information concerning [the village's] plan to build a village parking lot," as well as obtaining "more than $75,000 in profit from the sale" of the property.

 Under the federal mail fraud statute, an individual may not "devise or intend[ ] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. "The essential elements of a mail fraud violation are (1) a scheme to defraud, (2) money or property, and (3) use of the mails to further the scheme." *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991) (citations omitted). With respect to the second element (the only one at issue on this appeal), "the government is not required to show that the intended victim was actually defrauded. The government need only show that the defendant contemplated some actual harm or injury." *Id.* (citing *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987); *see also United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.1970)).

Johnsen challenges the court's instructions to the jury with respect to counts four through eight. All five of these acts transpired prior to November 18, 1988, the effective date of 18 U.S.C. § 1346, which amended the mail and wire fraud statutes to cover schemes "to deprive another of the intangible right of honest services." Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, tit. vii, § 7603(a), 102 Stat. 4181, 4508. Congress adopted section 1346 in reaction to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *See United States v. Miller*, 997 F.2d 1010, 1016 n. 5 (2d Cir.1993). *McNally* held that § 1341 is "limited in scope to the protection of property rights." 483 U.S. at 360, 107 S.Ct. at 2882. Accordingly, the district court instructed the jury that "the crime of mail fraud with regard to counts four to eight can only involve money or property and not honest services."

The language challenged by Johnsen instructs the jury that "the right to material information concerning the expenditure of public monies, is a property right, intangible though it is, and it is included in the mail fraud statute, even prior to November 18, 1988...." Defendant Johnsen contends that the district court erred in refusing to give a submitted charge that the information withheld must have "placed the Village at an[ ] *economic* disadvantage ... [in other words]

whether such hidden interest caused the Village to purchase the property at a higher cost than it would have otherwise paid...." The district court's refusal to amplify the charge on "material information" in that way, according to Johnsen, permitted the jury to convict him under § 1341 on nothing more than a breach of fiduciary duty, something *McNally* foreclosed for conduct prior to the enactment of § 1346. Because this raises a "doubt as to whether a conviction is predicated on an impermissible ground," Johnsen urges, "that doubt must be resolved in the defendant's favor and the conviction vacated." *Ingber v. Enzor,* 841 F.2d 450, 456 (2d Cir.1988).

The government, on the other hand, argues that the test for materiality under the mail fraud statute is the same as the test for materiality under the securities laws: whether "the concealed information had the reasonable potential to affect an economic decision." United States Brief at 41 (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 150–54, 92 S.Ct. 1456, 1470–72, 31 L.Ed.2d 741 (1972)). According to the government, it does not matter whether the towns would have suffered some economic loss if the scheme had been successful, because the loss of the "right to control" the expenditure of public funds, through the loss of the ability to make a fully informed decision, is sufficient to constitute mail fraud under § 1341.

We disagree. The "proscriptions [against fraud in the securities laws] ... are broad and ... obviously meant to be inclusive. The Court has said that the 1934 Act and its companion legislative enactments embrace a 'fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Affiliated Ute,* 406 U.S. at 151, 92 S.Ct. at 1471 (quoting *S.E.C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). The Supreme Court has emphasized that section 10(b) "was designed as a catchall clause to prevent fraudulent practices." *Chiarella v. United States,* 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980).

The mail fraud statute, however, does not enforce ethics in government in the way that the securities laws enforce ethics in business, certainly not prior to the addition of § 1346 in 1988. "The mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *McNally v. United States,* 483 U.S. 350, 356, 107 S.Ct. 2875, 2879, 97 L.Ed.2d 292 (1987). "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights." *Id.* at 360, 107 S.Ct. at 2881–82.

Where an individual standing in a fiduciary relation to another conceals material information that the fiduciary is legally obliged to disclose, that non-disclosure does not give rise to mail fraud liability unless the omission can or does result in some tangible harm. *United States v. Carpenter,* 791 F.2d 1024, 1035 (2d Cir.1986), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). However, lack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 "property."

To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction. *See Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) ("the words 'to defraud' in the mail fraud statute have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value....") (citations and internal quotations omitted). To convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature *or* that the village could have negotiated a better deal for itself if it had not been deceived. The jury should have been so instructed.

██ Johnsen's conduct concerning 10–12 Glovers Lane predates the November 18, 1988 amendment, and so is measured by the "money or property" requirement of *McNally*. As to that, a reasonable jury could have found that the filing of development plans was an effort to extract a premium price for the property by injecting a false sense of immediacy into the negotiations. Alternatively, a reasonable jury could have found that the village's offer for property that met its requirements was not enhanced by Johnsen's concealment of his role, and would have been affected by the disclosure only because the village would have refused to deal with him on general principles. (The evidence indicates that the mayor was concerned about Johnsen's relationship with Broidy.) In short, the evidence would support either a finding that Johnsen attempted to deprive the village of a property interest, or a finding that he did not. Absent a proper instruction, however, we cannot conclude that the jury's findings supported conviction.

The instruction given effectively permitted the jury to convict Johnsen for nothing other than a breach of fiduciary duty. Just last year, we declined to adopt a rule that would effectively "convert every breach of a fiduciary duty that is not openly confessed into a deprivation of § 1341 'property.'" *Miller*, 997 F.2d at 1021; *see also United States v. Covino*, 837 F.2d 65, 71–2 (2d Cir.1988) (reversing conviction because defendant "was charged with depriving employer of material information concerning breaches of his fiduciary duty, not with depriving it of property"). As this Court decided in *Miller*: "Such an extension is plainly inconsistent with the dictates of *McNally* and *Carpenter*." *Id.* Because it is possible that Johnsen was convicted for conduct that does not satisfy the requirements of the unamended statute, we must reverse his conviction on counts four through eight. *Ingber v. Enzor*, 841 F.2d 450, 456 (2d Cir.1988).

## II. Arthur Mittelstaedt

Mittelstaedt was convicted on one count of conspiring to commit mail fraud and several counts of filing false partnership income tax returns. He challenges all convictions in this appeal.

### A. Conspiracy to commit mail fraud

██ Title 18 section 371 of the United States Code makes it a crime for "two or more persons [to] conspire to commit any offense against the United States." " '[T]he gist of the crime of conspiracy as defined by the statute is the agreement ... to commit one or more unlawful acts,' from which it follows that 'the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects.'" *United States v. Broce*, 488 U.S. 563, 570, 109 S.Ct. 757, 763, 102 L.Ed.2d 927 (1989) (quoting *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942)); *see also United States v. Tejada*, 956 F.2d 1256, 1264 (2d Cir.) ("agreement defines the conspiracy"), *cert. denied,* —— U.S. ——, 113 S.Ct. 124, 121 L.Ed.2d 80 (1992); *United States v. Rubin*, 844 F.2d 979, 983 (2d Cir.1988) ("The fundamental element of a conspiracy is unlawful agreement."). In reviewing Mittelstaedt's conviction on this count, we therefore consult the agreement he made and determine whether that agreement could provide the basis for a conviction.

██ Mittelstaedt argues that the scope of his agreement encompassed only the first two transactions (271 Flanders Road and 11 Glovers Lane), that all conduct regarding these transactions pre-dated the addition of § 1346 in November 1988, and that those transactions could not have provided the basis for a conspiracy conviction because they do not satisfy the "money or property" requirement of *McNally*.

It is unquestionable that the Flanders Road deal was fully consummated in 1984, before the amendment took effect. As to 11 Glovers Lane, nothing happened after 1986 or 1987, when the property was transferred to JA & E Construction Corporation. The prosecution relies on a 1989 conversation initiated by a village official inquiring into the partnership's possible interest in reviving its application for a building permit (which the partnership declined to do), and argues that that conversation brought the transaction

into the post-amendment era. That conversation, however, merely confirmed that the transaction was dead or dormant and that the partnership had no interest in reviving it. Passively fielding the town's inquiry without pursuing it can scarcely be deemed an act in furtherance of the conspiracy. In summary, Mittelstaedt participated only in two transactions that were fully completed before the amendment that criminalized the exploitation of Johnsen's position of trust. His agreement to participate in these transactions predated that amendment. All of his acts likewise pre-dated the amendment. Indeed, all of the acts of Mittelstaedt's partners in respect of the two transactions in which Mittelstaedt participated also predated the amendment even though, after the amendment, his partners continued to do similar acts which had become criminal by virtue of the amendment.

We therefore conclude that, with respect to both of these transactions, all the acts pre-dated the statutory amendment, and must be tested under *McNally*'s "money or property" requirement. This is so despite the fact that Mittelstaedt was convicted of participation in a single conspiracy. A defendant charged in a single conspiracy is ordinarily held accountable for all unlawful acts of the conspiracy that are reasonably foreseeable, even without direct knowledge of them. *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). Perhaps recognizing his failure to raise the issue below, Mittelstaedt does not argue that the district court ought to have given a multiple conspiracy charge. His failure to seek and obtain a multiple conspiracy charge presents the issue of whether Mittelstaedt, as a party to a pre-amendment agreement with certain parties, can be held liable for the post-amendment acts of those parties with respect to transactions in which he was not involved. His conviction stands or falls on whether or not that agreement undertook a violation of federal law.

Mittelstaedt, Johnsen, Broidy and Tew entered into an agreement to exploit Johnsen's role as town engineer to enhance the profitability of their investments in real estate. With respect to Mittelstaedt, that agreement was a conspiracy to commit mail fraud only if its aim during his active participation (and prior to the amendment of the statute) was to deprive the towns of "money or property," or if Mittelstaedt reaffirmed or ratified that agreement, by word or deed, after it became unlawful. We can find no such illegal objective in Mittelstaedt's agreement. A breach of fiduciary duty, without more, does not constitute mail fraud under section 1341. *United States v. Miller*, 997 F.2d 1010, 1020 (2d Cir.1993) (victim must be deprived of money or property to convert "fiduciary delinquencies" into mail fraud); *United States v. Covino*, 837 F.2d 65, 70–71 (2d Cir.1988) (no mail or wire fraud for breach of fiduciary duty absent potential financial loss). Nothing in the indictment, trial record, or appellate briefs supports the view that the conspiracy sought to inflict a loss of money or property on the towns in respect of the only two transactions in which Mittelstaedt participated.

With respect to 271 Flanders Road, the government contends on appeal that, "by bribing the town employee, the conspirators sold the town a piece of property for $63,000 more than they had paid for it one year earlier, without any increase in value." However, it is undisputed that two independent appraisers separately opined that $108,-000 (the selling price) was a fair market value for this property. Further, there is no evidence in the record to indicate that any of the partners influenced this price in any manner. If, as the government argues, the property did not increase in value, the only other explanation for the difference between the $45,000 purchase price and the fair market appraised value is that the partners negotiated an extraordinarily good deal for themselves in their transaction with the estate. Making a profit in that way breached Johnsen's fiduciary obligations, but it does not constitute mail fraud.

The government further contends that Southampton paid an "inflated" price for 271 Flanders Road as a result of the bribe paid to a town official. The record confirms that, when Mr. Council presented the town's offer to the partnership, he de-

manded—and ultimately was paid—a $10,000 bribe. Although bribery is not a *per se* violation of the (pre-§ 1346) mail fraud statute, an act of bribery can be mail fraud if—and only if—it is part of a scheme to deprive someone of "money or property." *See United States v. King*, 860 F.2d 54 (2d Cir.1988) (per curiam), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989). Therefore, the bribe to Mr. Council theoretically could support a mail fraud conviction if the bribe inflated the cost of the property to the town. However, this theory is nowhere mentioned in the indictment, was not argued to the jury, and was not addressed in the jury charge. We refuse to affirm a conviction based upon a theory that was never presented to the jury.

 Another government theory, presented in the indictment, is that Johnsen "use[d] his position as [Southampton's] town engineer to facilitate any commercial development applications or proposals," and "use[d] his position as [Westhampton Beach's] village engineer to facilitate approval of [the plan] for commercial development of 11 Glovers Lane." (Notably, the government fails to put forward a single argument in its brief supporting the contention that the plan involving 11 Glovers Lane satisfies *McNally*.) The issuance of a permit or license, even if induced by fraud, does not constitute a deprivation of property as that term has been construed by this Court. "Whether it chooses to use licenses or blanket rules, the government's purpose is to control the private use of private property. Thus, a regulatory license is nothing more than a formal embodiment of 'the necessary government approval.' " *United States v. Schwartz*, 924 F.2d 410, 417 (2d Cir.1991) (quoting *United States v. Evans*, 844 F.2d 36, 37 (2d Cir.1988)). While *Schwartz* addressed the specific issue of arms export licenses, we have applied that analysis to land use regulation as well. *See United States v. Novod*, 923 F.2d 970, 973–75 (2d Cir.1991). Only if the permit or license is used as part of a scheme to defraud a local government of money or property will we affirm a mail fraud conviction based in part on land use permits. In *United States v. Paccione*, 949 F.2d 1183 (2d Cir.1991), *cert. denied*, — U.S. —, 112

S.Ct. 3029, 120 L.Ed.2d 900 (1992), we affirmed a mail fraud conviction for the fraudulent procurement of a license to operate a garbage dump, where that license was necessary to effectuate a scheme to deprive the city and state of New York of dumping fees. The opinion, however, distinguished *Schwartz* and *Novod* on the ground that the unpaid dumping fees constituted the property of which the government was deprived: "[t]here was no suggestion to the jury that it was allowed to convict defendants of mail fraud on the basis that the City and State permits were themselves property." 949 F.2d at 1194–95.

Conspiracy, as defined by the federal statute, requires an agreement to violate some federal law. Because none of the schemes in which Mittelstaedt participated involved an attempt to deprive another of "money or property," there can have been no conspiracy in violation of 18 U.S.C. § 371 until after November 18, 1988—the date on which Johnsen's breaches of trust (when effectuated with at least one use of the mails) became a federal crime. By that time, however, Mittelstaedt was no longer involved in the enterprise. Although a conspirator ordinarily may be held liable for the unlawful acts of co-conspirators, this conspiracy did not become unlawful, and thus did not become a conspiracy—under federal law—until after the November 18, 1988 amendment to the mail and wire fraud statutes. The object of the scheme Mittelstaedt agreed to did not constitute an offense against the United States at the time he entered into the agreement, and did not become criminal during the course of his participation. Since there is no evidence of post-amendment ratification or reaffirmation by Mittelstaedt, we must reverse.

## B. Tax Counts

 Mittelstaedt was convicted on three counts of filing false partnership tax returns, in violation of 26 U.S.C. § 7206(1). He contests his convictions on several grounds. First, he argues that the first count, Count 11, was barred by the statute of limitations. This return was filed on July 21, 1986. Since the indictment was filed on July 20, 1992,

within the six year limitations period, his argument is meritless. 26 U.S.C. § 6531(5).

■ He also contends that the district court erred in its instruction to the jury that failure to disclose Johnsen's partnership interest in JA & E was a material matter. Mittelstaedt did not object to this instruction. We therefore review it for plain error, *United States v. London,* 753 F.2d 202, 205 (2d Cir.1985); Fed.R.Crim.P. 30, 52, and find none: omitting Johnsen's ownership interest was material because it "had the potential for hindering the IRS's efforts to monitor and verify [Johnsen's] tax liability." *United States v. Greenberg,* 735 F.2d 29, 32 (2d Cir.1984). We therefore affirm Mittelstaedt's convictions on Counts 11 through 13.

### Conclusion

We reverse Johnsen's convictions on Counts 4 to 8. We affirm his conviction on all other counts. We reverse Mittelstaedt's conviction on the conspiracy count. We affirm his conviction on the tax counts. We therefore vacate the sentences of both defendants and remand to the district court for resentencing.