14-3213-cr(L)
United States v. Christopher Finazzo, Douglas Dey

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2015
No. 14-3213-cr(L), 14-3330-cr(Con)

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

CHRISTOPHER FINAZZO, DOUGLAS DEY,
*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of New York.
No. 10-cr-457 — Roslynn R. Mauskopf, *Judge*.

ARGUED: SEPTEMBER 17, 2015
DECIDED: MARCH 7, 2017

Before: SACK, CHIN, and DRONEY, *Circuit Judges*.

Consolidated appeal from judgments of conviction of the United States District Court for the Eastern District of New York (Mauskopf, *J.*) following a guilty plea to conspiracy by Dey and a jury verdict convicting Finazzo on one count of conspiracy to commit mail and wire fraud and to violate the Travel Act; fourteen counts of mail fraud; and one count of wire fraud. Finazzo contends that the district court's jury instructions regarding the "right to control" property under the mail and wire fraud statutes were erroneous and that there was insufficient evidence to support his convictions on the mail and wire fraud counts. Finazzo and Dey also appeal from the restitution order in the amount of $13,690,822.94 imposed by the district court jointly and severally against them, arguing that the district court improperly used Finazzo's gain as a measure of the victim's loss. We **AFFIRM** in part and **VACATE** and **REMAND** in part.

————————————

ROBERT J.A. ZITO (Alan S. Lewis, Karen E. Meara, Madelyn K. White, *on the brief*), Carter Ledyard & Milburn LLP, New York, New York, *for Defendant-Appellant Christopher Finazzo*.

T. BARRY KINGHAM (Jacques Semmelman, Rachel L. Cohn, *on the brief*), Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, New York, *for Defendant-Appellant Douglas Dey*.

WINSTON M. PAES, Assistant United States Attorney (Amy Busa, Claire S.

Kedeshian, Assistant United States Attorneys, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

DRONEY, *Circuit Judge*:

Defendant-Appellant Christopher Finazzo is a former merchandising executive for teen apparel retailer Aéropostale, Inc. Defendant-Appellant Douglas Dey controlled South Bay Apparel Inc. ("South Bay"), a clothing vendor. Between 1996 and 2006, Finazzo caused Aéropostale to use South Bay as its supplier of T-shirts and fleeces in exchange for secret payments to Finazzo of portions of South Bay's profits. As a result of this scheme, Finazzo and Dey were charged in the United States District Court for the Eastern District of New York with one count of conspiracy to commit mail and wire fraud and to violate the Travel Act, as well as fourteen counts of mail fraud and one count of wire fraud.

Dey pleaded guilty to conspiracy to violate the Travel Act and was sentenced to 42 months' imprisonment. Finazzo was convicted of all counts[1] after a three-week jury trial. The jury rendered a special verdict. On the conspiracy count, the jury found Finazzo guilty of conspiracy to commit mail fraud "[o]n the basis of intent to deprive Aéropostale of money" and "[o]n the basis of Aéropostale's right to control use of its assets." Dist. Ct. Dkt. No. 260, at 2. It found Finazzo guilty of conspiracy to commit wire fraud on the basis of Aéropostale's right to control use of its assets, but not on the basis of intent to deprive Aéropostale of money. On each of the fourteen substantive mail fraud counts and the substantive wire fraud count, the jury found Finazzo guilty on the basis of Aéropostale's right to control use of its assets, but not on the basis of intent to deprive

---

[1] The indictment originally included seventeen counts, but the Government voluntarily dismissed Count Seventeen in advance of trial, so Finazzo was convicted on all counts that were presented to the jury.

Aéropostale of money.[2] The district court (Mauskopf, *J.*) sentenced Finazzo to 8 years' imprisonment on the substantive mail and wire fraud counts and 5 years' imprisonment on the conspiracy count, all to run concurrently. The court also imposed a $13,690,822.94 restitution order jointly and severally against Finazzo and Dey.

Finazzo does not challenge his conspiracy conviction in this appeal. He challenges only his convictions on the mail and wire fraud counts. Both Finazzo and Dey also challenge the restitution order.

In this opinion, we address: (1) Finazzo's challenge to the district court's jury instructions regarding the "right to control" property under the mail and wire fraud statutes, (2) the sufficiency of the evidence to support Finazzo's convictions for depriving Aéropostale of the "right to control" its assets, and (3) Finazzo's and Dey's challenge to the district court's restitution order. We affirm

---

[2] The jury also found Finazzo guilty of conspiracy to violate the Travel Act and rendered a forfeiture verdict in the amount of $25,790,822.94.

the district court's "right to control" jury instructions and conclude that there was sufficient evidence to support the challenged portions of the jury verdict. However, we vacate and remand the district court's restitution order as to Finazzo and Dey. In a summary order issued simultaneously with this opinion, we affirm the district court on the remaining issues on appeal.

**BACKGROUND**

Finazzo and Dey were first indicted on June 8, 2010. The original indictment alleged that Dey and Finazzo "agreed that Finazzo would cause Aéropostale to use South Bay as a vendor to purchase merchandise at rates that were less favorable to Aéropostale than the prevailing market rate." Dist. Ct. Dkt. No. 1, at 3. "In exchange, Dey covertly paid Finazzo approximately fifty percent of South Bay's profits" through C & D Retail Consultants, Inc. ("C&D")—a consulting business controlled by Finazzo—and through various joint ventures. *Id.* The indictment alleged that

Finazzo and Dey did not disclose this scheme to Aéropostale. The indictment further stated that, between August 1996 and November 2006, Finazzo caused Aéropostale to pay South Bay more than $350 million in payments for its merchandise. Over that period, Dey paid Finazzo more than $14 million through bank transfers to C&D and transferred over $13 million to three jointly owned entities: Vertical Line Apparel, Inc., Vertical Line Apparel II, Inc., and Vertical Line Apparel III, Inc. (the "Vertical Line entities").

The September 6, 2011 Second Superseding Indictment[3] added that Finazzo and Dey defrauded Aéropostale by:

> (1) depriving Aéropostale of the opportunity to make informed decisions, thereby preventing Aéropostale from seeking lower prices for merchandise it purchased from South Bay and the opportunity to select other vendors based upon price, quality and timely delivery; and (2) causing Aéropostale to pay higher prices on merchandise it purchased from South Bay than were available from other vendors, thereby increasing South Bay's profits and the amounts Dey paid Finazzo.

---

[3] On December 14, 2010, the Government had filed a First Superseding Indictment.

7

Dey App'x at 59. That indictment included seventeen counts. Count One alleged conspiracy to commit mail and wire fraud and to violate the Travel Act from August 1996 to November 2006 in violation of 18 U.S.C. § 371. Counts Two through Fifteen alleged mail fraud in violation of 18 U.S.C. § 1341. Count Sixteen alleged wire fraud, in violation of 18 U.S.C. § 1343, and Count Seventeen alleged a false statement in a report required to be filed with the Securities and Exchange Commission, in violation of 15 U.S.C. § 78ff(a).[4] Like the conspiracy charge, the scheme to defraud for the mail and wire fraud counts was also alleged to have taken place between August 1996 and November 2006. The mail and wire fraud counts were linked to fifteen specific payments by Aéropostale to South Bay between June 9, 2005 and November 1, 2006.

On September 27, 2012, Dey pleaded guilty to conspiracy to violate the Travel Act. In his plea agreement, Dey agreed to a

---

[4] As noted above, the Government voluntarily dismissed Count Seventeen in advance of trial, and therefore that count is not at issue in this appeal.

8

$7,500,000 forfeiture order, but specifically reserved the right to appeal any restitution order imposed by the court.

A. Finazzo's Trial

Finazzo's case proceeded to a three-week jury trial on the Second Superseding Indictment, beginning on April 8, 2013. At trial, the Government called fifteen witnesses—most of whom were current or former Aéropostale employees—and the defense called three witnesses. Because one of the issues on appeal is sufficiency of the evidence, we recount in some detail the evidence presented at trial.

1. The Government's Case

a. The Creation of the South Bay Relationship with Aéropostale

In July 1996, Julian Geiger—Aéropostale's President and CEO—hired Finazzo as its Men's Divisional Merchandising Manager.[5]

---

[5] Finazzo was eventually promoted to Executive Vice President and Chief Merchandising Officer of Aéropostale.

Prior to being hired by Aéropostale, Finazzo owned a small sports-clothing retailing business called C&E Marketing, at which Dey was an employee. Shortly after Finazzo was hired by Aéropostale, Peter Conefry—Finazzo's and Dey's former private accountant and a cooperating Government witness—attended a meeting with Finazzo and Dey in which Finazzo stated that he and Dey were going to a start a new company that would do business with Aéropostale.[6] Conefry testified that he told Finazzo that Finazzo "better be careful because if you have a relationship with a vendor as an employee of [a] company it could create a problem." Dey App'x at 1229. Conefry advised Finazzo to check with Aéropostale before proceeding with the new company. Finazzo responded that he "didn't think Aéropostale would go for it." *Id.* Nevertheless, in August 1996, Dey incorporated South Bay Apparel,

---

[6] Conefry testified pursuant to a non-prosecution agreement with the Government.

Inc. South Bay's business with Aéropostale comprised approximately 99% of South Bay's total business from 1996 to 2006.

In 1998, Finazzo started C&D. Finazzo told Conefry—who also acted as South Bay's and C&D's accountant—that he formed C&D so that he could receive "consulting fees" for directing Aéropostale's business to South Bay. *Id.* at 1232. Indeed, Conefry testified that C&D primarily received payments from South Bay.

Initially, Finazzo and Dey had an informal agreement pursuant to which Finazzo simply told Dey to send funds to C&D. As the South Bay supply business with Aéropostale grew larger, Conefry was directed to split South Bay's net profits nearly evenly between South Bay—owned by Dey—and C&D—owned by Finazzo. Although these payments from South Bay to C&D were not for actual consulting, Conefry classified them as such on South Bay's books. *Id.* at 1234–36. The payments steadily increased from $355,000 in 1998 to $5,161,550 in 2004. In 2005, the payments from

11

South Bay to C&D totaled approximately $13 million, and Conefry classified them as cost of sales, because $13 million in consulting fees "would be a red flag." *Id.* at 1236. Conefry testified that, throughout this time period, he discussed these payments with Finazzo annually during the preparation and filing of Finazzo's tax returns. When Conefry pushed Finazzo to disclose the arrangement to Aéropostale, Finazzo responded that "it was too late at this time." *Id.* at 1238. In response to Conefry's concern that Aéropostale becoming a public company in 2002 could bring scrutiny from the Securities and Exchange Commission, Finazzo told Conefry "it's gone along so far so we will just continue." *Id.* at 1240.

Finazzo and Dey also jointly owned the Vertical Line entities. These entities served as vendors to Aéropostale as well. In addition, Finazzo and Dey jointly owned other South Bay entities, including South Bay Sports Plex, South Bay Ticketing, and South Bay Knitting (the "related South Bay entities").

12

Michael Cunningham—the Chief Financial Officer of Aéropostale during this time period—testified that once Aéropostale went public in 2002, Finazzo was required to regularly complete director and officer ("D&O") questionnaires and other related-party transaction documents. The D&O questionnaires asked whether Finazzo had a significant ownership interest in any Aéropostale vendor or received money from the vendor. Finazzo received training on multiple occasions to ensure that he understood his responsibility to disclose any such interests. Nevertheless, Finazzo stated on these questionnaires that he was not an officer, director, or partner of any other company; received no bribes or kickbacks from any third-party vendor; and did not engage in any related-party transactions.

b. <u>South Bay's Transactions with Aéropostale</u>

CEO Geiger testified that Aéropostale started using South Bay as a vendor on Finazzo's recommendation in either late 1996 or early

13

1997. South Bay sold Aéropostale graphic T-shirts and, eventually, fleeces. Various former and current employees of Aéropostale testified about the complete control Finazzo had over Aéropostale's vendor selection and pricing, and his use of that control to direct business towards South Bay.

CFO Cunningham testified that the "quantities of goods" bought from particular vendors needed to be approved by Finazzo and that Finazzo was "responsible for the overall final price that was being negotiated with the vendors." Dey App'x at 615. Edward Slezak—Aéropostale's General Counsel—stated that Finazzo was "the number two person" at Aéropostale. *Id.* at 829. He testified that Finazzo "was responsible for all aspects of our product." *Id.* "[Finazzo] decided what type of product we would buy, how much of it, which vendors would manufacture the product, how it looked, [and] how it was merchandised in our stores." *Id.*; *see also id.* at 857 ("[Finazzo] was the one who directed all of our product placement,

what we made, how much we made, . . . who got the orders, who made the product.").

### i. Graphic T-Shirt Suppliers

Regarding graphic T-shirts, Geiger testified that from 2002 through 2006 Finazzo was the executive primarily responsible for vendors, vendor selection, and vendor pricing. He also stated that Finazzo had "the final say" regarding the number of graphic T-shirts ordered by Aéropostale. Dey App'x at 1400–01.

Cunningham and Geiger both recounted that, in early 2005, Geiger recommended to Finazzo that Aéropostale shift 25% of the T-shirts it was buying from South Bay to overseas vendors in order to achieve "significant cost savings." *Id.* at 639. Geiger believed that, for certain "core" graphic T-shirts with demand that was easy to predict, Aéropostale could accommodate the longer delivery time from overseas,[7] while taking advantage of lower costs. *Id.* at 639–40,

---

[7] South Bay was located in Calverton, New York.

15

1384. Geiger estimated that Aéropostale could save $1.50 per T-shirt made overseas. Given the volume of T-shirts being sold, Cunningham estimated that this would have saved Aéropostale at least $5 million, while Geiger estimated savings of $6 million.

Finazzo initially stated that "he would look into it." *Id.* at 640. As the year progressed, Finazzo became "agitated" that Geiger continued to press him on the matter. *Id.* At one meeting where the topic was discussed, Finazzo smacked the table, told Geiger that the meeting was over, and slammed the door shut as he left. Finazzo never moved 25% of the graphic T-shirt business overseas as Geiger had directed.

Geiger also testified that Aéropostale's profit margin on graphic T-shirts during the time Finazzo was the head of merchandising tended to be less than the profit margin of other similar products Aéropostale sold. Geiger discussed these low margins at executive meetings attended by Finazzo. On many

16

occasions, Finazzo would respond by hitting the table with his hands "and basically say[ing] why are people looking so closely at this?" *Id.* at 1381. Geiger recalled that Finazzo once declared that Geiger "wasn't allowed to ask [Finazzo] any questions about graphic T-shirts for a month." *Id.*

Jennifer Heiser—an Aéropostale employee who merchandised graphic T-shirts and reported to Finazzo—testified that the graphic T-shirt business in particular "was [Finazzo's] baby" and that he was involved in that business "a lot more than [he was involved in] any other department." *Id.* at 708. She also testified that she "really was not allowed to bring in other manufacturers [besides South Bay]." *Id.* at 707. Heiser believed that bringing in additional manufacturers would allow Aéropostale to obtain "the best price and the best quality" because vendors would be forced to bid against each other for Aéropostale's business. *Id.* at 707–08. She stated that she therefore tried to place graphic T-shirt orders with

vendors in Singapore. However, Finazzo "discouraged" Heiser from placing orders in Singapore, such that she "really felt that [she] had to put all of [her] business with South Bay." *Id.* at 707. On one occasion, when Heiser pushed Finazzo regarding the poor margins achieved by only using South Bay for graphic T-shirts, Finazzo "broke a pencil and said, we are using South Bay, end of story." *Id.* at 718. Heiser ultimately placed 97-99% of her graphic T-shirt orders with South Bay.

Heiser also testified that Jody Green—an associate merchandiser in men's graphic T-shirts—often challenged Finazzo about the pricing of graphic T-shirts and asked why they could not use other manufacturers to get a better cost. Finazzo fired Green just three months after she started working at Aéropostale.

John DiBarto—Aéropostale's Divisional Merchandising Manager for the Men's Division at the time of Finazzo's scheme— testified that Finazzo "was responsible for negotiating prices on the

graphic tee products with South Bay." *Id.* at 1098. DiBarto stated that he did not try to negotiate prices with South Bay "[b]ecause . . . that was [Finazzo's] thing. He controlled production. And that was . . . his baby from the beginning, so . . . we did whatever he wanted." *Id.* Similarly, DiBarto never asked for an overall reduction in price from South Bay "[b]ecause it wasn't going to happen. . . . Those were variables that wouldn't change, because they were [Finazzo's] . . . he's in charge of that." *Id.* at 1128–29.

When employees tried to "mess[] with [pricing] a little bit, it wasn't worth it, [Finazzo] would get angry." *Id.* at 1129. For instance, when DiBarto asked Dey for a price breakdown of South Bay's T-shirts by component to compare to another vendor, Finazzo and Dey yelled at him, saying "we're not going to do this, why are you doing this, we're not going to do business with anybody else but South Bay, don't waste your time." *Id.* at 1132–34. When Finazzo heard that Thomas Carberry—a new employee working under

19

DiBarto—had questioned South Bay's costing structure, Finazzo emailed DiBarto: "John, I would like to let you know that I hear that Tom Carberry is talking about South Bay to other people in the company. I will not tolerate that, and I will be swift in my actions." *Id.* at 1144. In an October 21, 2006 email to DiBarto and others, Finazzo summarized his position on using South Bay as the primary graphic T-shirt supplier: "I will not change our vendor structure or the way we set up this business and I guess I can make that decision. I want South Bay to be the main T-shirt supplier." *Id.* at 1175–76.

Jill Kronenberg—the former head of the Women's Division at Aéropostale—testified that prior to 2003, Aéropostale's women's graphic T-shirt business was split between South Bay and a vendor called Mias, with Mias having the majority of the business. Finazzo instructed Kronenberg to transfer business from Mias so that South Bay would have 50% of the women's graphic T-shirt business. Finazzo issued this instruction despite the fact that the graphic T-

shirts made by Mias were of better quality and lower priced. Although she did not want to move business away from Mias, Kronenberg ultimately did so in 2004 "[b]ecause it reached a point where . . . basically [she] had no choice." *Id.* at 994–95. Kronenberg voiced concerns with Finazzo about the decision to transfer more business to South Bay but was unable to change his mind.

### ii. Fleece Suppliers

Megan Lauritano—a senior product manager at Aérospostale from 2004 to 2006—testified that, in 2004, Finazzo made the decision to expand Aéropostale's use of South Bay as a supplier to fleece products as well.[8] South Bay was not a "known vendor" for fleece products at the time. Dey App'x at 1958. Lauritano testified that Finazzo determined the price and quantity of fleece orders with South Bay.

---

[8] At trial, Lauritano was called by the defense, but she testified extensively on cross-examination about Aéropostale's use of South Bay as a fleece vendor.

She explained that South Bay's performance in the fleece business in 2004 was poor, including significant delivery delays that Aéropostale did not experience with other fleece vendors. Nevertheless, Finazzo dictated that Aéropostale continue buying fleece product from South Bay. When Lauritano informed Finazzo in 2005 that she had done a cost comparison analysis of South Bay and other fleece vendors and found that South Bay was not competitive, Finazzo nevertheless directed her to place an order with South Bay. South Bay continued to have delivery problems in 2005, and Lauritano proposed that South Bay give Aéropostale discounts to account for the markdowns Aéropostale was forced to take on late fleece deliveries. Finazzo ultimately decided that South Bay would not be required to discount those products.

Despite these problems, Finazzo still directed placement of fleece orders with South Bay in 2006, negotiating the prices himself. Lauritano testified that South Bay continued to have delivery delays,

"some of them [by] several months." *Id.* at 1984. She stated that she again proposed that South Bay give Aéropostale a discount, but Finazzo decided not to pursue one.

George Justin Meno—a product manager of men's knits at Aéropostale starting in September 2005—estimated that South Bay's "egregious" delivery delays for fleece products in 2005 and 2006 cost Aéropostale approximately $1.8 million in lost sales. *Id.* at 760, 767. Because of these delivery delays, Meno suggested looking into pricing for overseas vendors. Finazzo did not authorize this effort. When Meno requested discounts from South Bay to compensate for the delays, Finazzo made it clear that Meno "needed to back off a little bit from South Bay" and refused to request any discounts. *Id.* at 766–68.

Similarly, Jinah Jung—an Aéropostale product manager—testified that she did not want to purchase fleece products from South Bay "[b]ecause their costs [were] always high and their

quality was subpar." *Id.* at 1051. Nevertheless, she purchased fleece products from South Bay at Finazzo's direction, because Finazzo had "the final say" on the orders. *Id.* at 1052, 1055. On February 14, 2005, Jung sent Finazzo an email stating that the $6.85 price Finazzo agreed upon for a South Bay fleece order was "really high," and that she "kn[e]w" she could "get it for a low $6 range." *Id.* at 1053. She specifically noted that Aéropostale "could have saved approximately $300,000" on the order. *Id.* Finazzo refused to change the order, responding: "Yes, that is the price I agreed with [Dey] on." *Id.* at 1055.

### iii. Scope of the Transactions

Aéropostale eventually learned of Finazzo's and Dey's scheme when, during an unrelated investigation of Finazzo's conduct, Aéropostale discovered an August 24, 2006, email to Finazzo from his estate planning attorney that disclosed Finazzo's ownership

24

interest in South Bay, the related South Bay entities, and the Vertical Lines entities.[9] Finazzo was terminated on November 7, 2006.

Michael Braconi, an FBI Special Agent, testified that, overall, Aéropostale paid South Bay and the Vertical Line entities $267,078,261.41 between June 2002 and November 2006. South Bay, in turn, paid C&D—which was wholly owned by Finazzo— $21,223,831.14 during that same time period. South Bay also paid the related South Bay entities—which were co-owned by Finazzo and Dey—$2,959,520. Additionally, South Bay paid the Vertical Line entities—which were also co-owned by Finazzo and Dey— $6,174,463.60. Half of South Bay's payments into those jointly-owned entities—equalling Finazzo's share of the companies—amounted to $4,566,991.80. South Bay's total payments to Finazzo therefore amounted to the sum of South Bay's payments to C&D

---

[9] Aéropostale was able to see the email between Finazzo and his lawyer because Finazzo used the company's email system and had been advised that the company email system could be monitored and accessed by the company without permission.

($21,223,831.14) and Finazzo's one-half share of South Bay's payments to the jointly-owned entities ($4,566,991.80). Thus, Braconi testified that South Bay paid Finazzo $25,790,822.94 in kickbacks between June 2002 and November 2006.[10]

In connection with the mail fraud counts, CFO Cunningham testified that Aéropostale sent fourteen checks via UPS to South Bay as listed at Counts Two through Fifteen of the indictment. In connection with the wire fraud count, David Libenson, Vice President of Financial Operations at Aéropostale, testified that Aéropostale sent a wire transfer to South Bay as listed in Count Sixteen of the indictment. These payments were made from June 9, 2005 through November 1, 2006.

---

[10] Although the period of the charged conspiracy and wire and mail fraud scheme was from August 1996 to November 2006, the Government only presented evidence through Special Agent Braconi as to the amount of the kickbacks for the period of June 2002 to November 2006. Braconi testified that he did not have access to bank records for South Bay, Vertical Line, or Finazzo for the period before June 2002.

### c. Effect of Related-Party Transactions on Aéropostale

In addition to the testimony regarding Finazzo's steering of business to South Bay, several witnesses testified about the effect of these related-party transactions on Aéropostale's business.

CFO Cunningham testified that it was important for Aéropostale to know about all related-party transactions involving Aéropostale employees. He explained that "if the employee is receiving a benefit [from a vendor] and if that employee is also involved in transacting business with that vendor, the prices that we pay may not be the best price or the fair market value for that product or service." Dey App'x at 601. Similarly, General Counsel Slezak testified that Aéropostale wanted to know about related-party transactions "because you want to make sure that the company is getting the best possible deal, the best benefit of the bargain." *Id.* at 827. CEO Geiger testified that related-party

transactions "could easily reduce [Aéropostale's] profitability and how much money [Aéropostale] made." *Id.* at 1415.

Given that Finazzo was on both sides of the transactions between Aéropostale and South Bay, Slezak testified that "[t]here is no way that . . . Aéropostale got the benefit of the bargain or got the best market prices or got the best . . . engagement with our vendor that we could possibly get." *Id.* at 858. He concluded: "Honestly, I felt every penny that [Finazzo] ever got from South Bay should have been ours." *Id.* Similarly, Geiger testified that Finazzo profiting from South Bay-related vendors "would directly diminish Aéropostale's ability to maximize its profits because monies were going elsewhere that could have gone to the company." *Id.* at 1418. He concluded that "any profits that [Finazzo] would have gotten, in my mind, would have [otherwise] accrued to the company[,] increasing its profitability, the value to the shareholders[,] and made Aéropostale stronger." *Id.* at 1423.

28

## 2. The Defense Case

Finazzo called three witnesses at trial: Wade Mosteller, Doris Wilshere, and Megan Lauritano.

Wade Mosteller—a retail management consultant whose employer had been engaged by Aéropostale in 2004—testified about the importance of quick replenishment of stock to Aéropostale. Mosteller explained that Aéropostale could increase profitability by decreasing the time between when goods were ordered and when Aéropostale received them in stores. Doing so would allow shirts that were selling well to remain in stock and continue selling. Mosteller testified that South Bay, a local vendor in nearby Long Island, was able to supply graphic T-shirts to Aéropostale's distribution center on the east coast quicker than an overseas vendor could.

Doris Wilshere—the former head of the Men's Division and Women's Division at Aéropostale—testified that South Bay was

29

"exceptional" as a replenishment vendor. Dey App'x at 1833. She testified that South Bay's women's graphic T-shirts were higher quality and had a shorter delivery time than those purchased from Mias—Aéropostale's other major women's graphic T-shirt vendor. Wilshere also stated that South Bay's willingness to hold and store inventory was valuable in light of Aéropostale's "fickle" teenage customer base, which often required Aéropostale to quickly start printing new styles. *Id.* at 1832, 1836.

Additionally, Wilshere claimed that it was not unusual for Aéropostale to remain loyal to long-time vendors even when those vendors encountered production difficulties such as South Bay's fleece-product delivery delays. Lauritano—the Aéropostale senior product manager—also testified that it was not unusual for Aéropostale to remain committed to long-term vendors, even if that meant paying higher prices.

### 3. Jury Verdict

On April 25, 2013, the jury rendered a verdict finding Finazzo guilty on all counts. For each count, except the portion of Count One concerning Travel Act conspiracy, the verdict sheet asked the jury to determine whether it found Finazzo guilty "[o]n the basis of intent to deprive Aéropostale of money" and/or "[o]n the basis of Aéropostale's right to control use of its assets." Dist. Ct. Dkt. No. 260. On the conspiracy count, the jury found Finazzo guilty of conspiracy to commit mail fraud on the basis of intent to deprive Aéropostale of money and on the basis of Aéropostale's right to control use of its assets. It found Finazzo guilty of conspiracy to commit wire fraud on the basis of Aéropostale's right to control use of its assets, but not on the basis of intent to deprive Aéropostale of money. On each of the fourteen substantive mail fraud counts and the substantive wire fraud count, the jury found Finazzo guilty on

31

the basis of Aéropostale's right to control use of its assets, but not on the basis of intent to deprive Aéropostale of money.

Following the trial, Finazzo renewed his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, moved for a new trial under Rule 33, and moved to arrest the judgment for lack of jurisdiction of the charged offense under Rule 34.[11] The district court denied Finazzo's motions in a written order dated January 14, 2014.

B. Sentencing

On August 6, 2014, the district court sentenced Dey to 42 months' imprisonment, followed by three years' supervised release. On August 20, 2014, the district court sentenced Finazzo to eight years' imprisonment on each of Counts Two through Sixteen and five years' imprisonment on Count One—all to run concurrently—

---

[11] Finazzo did not challenge his conviction on Count One (the conspiracy count) before the district court and, as mentioned above, he does not challenge it on appeal. Thus, he only challenges his counts of conviction for the substantive mail and wire fraud offenses.

followed by three years' supervised release. Pursuant to an August 1, 2014 Memorandum and Order, the district court imposed a $13,690,822.94 restitution order jointly and severally on Finazzo and Dey. These consolidated appeals followed.

**DISCUSSION**

A. <u>"Right to Control" Jury Instructions</u>

Finazzo challenges the district court's "right to control" jury instructions for the substantive mail and wire fraud counts.[12] He argues: (1) that the "right to control" assets does not constitute "property" under the mail and wire fraud statutes, because it is not "obtainable," and (2) that the jury instructions improperly permitted

---

[12] The federal fraud statutes prohibit the use of the mails, 18 U.S.C. § 1341, or wires, 18 U.S.C. § 1343, in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." "Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way." *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991). The elements of both offenses are: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)) (internal quotation marks omitted).

33

him to be convicted without proof that he caused or intended to cause harm to Aéropostale.

We review challenged jury instructions *de novo*, but will only reverse if the instructions, taken as a whole, prejudiced the defendant. *United States v. Rutigliano*, 790 F.3d 389, 401 (2d Cir. 2015). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) (quoting *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (per curiam)) (internal quotation marks omitted).

1. "Obtainable" Property

Relying on *Sekhar v. United States*, 133 S. Ct. 2720 (2013), Finazzo contends that the district court's "right to control" jury instructions were erroneous because the district court failed to instruct the jury that the property sought through the fraud must be "obtainable" to satisfy the mail and wire fraud statutes. He argues

that his mail and wire fraud convictions must therefore be vacated because Aéropostale's right to control its assets is not "obtainable" property. *See* Finazzo Br. at 62 ("Because Aéropostale's decision making, its corporate governance, was not property that could be obtained by Mr. Finazzo, his wire/mail fraud convictions must be vacated."). We reject his argument and hold that the mail and wire fraud statutes do not require that the property involved in the fraud be "obtainable."

In *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003), respondents brought a class action suit alleging that petitioners—abortion opponents who attempted to shut down health-care clinics that performed abortions—committed Hobbs Act extortion. *Id.* at 397–98. Under the Hobbs Act, "extortion" is defined as "the *obtaining of property from another*, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis

added). The Supreme Court ruled that the Hobbs Act "require[s] that a person must 'obtain' property from another party to commit extortion." *Id.* at 404. Because petitioners "did not obtain or attempt to obtain property from respondents" by protesting abortion clinics, the Court concluded that they did not commit Hobbs Act extortion. *Id.* at 409.

In *Porcelli v. United States*, 404 F.3d 157 (2d Cir. 2005), the appellant—an operator of multiple gas stations who devised a scheme to avoid paying New York state sales tax on his gasoline sales, *see id.* at 158—invoked *Scheidler*, arguing that his mail fraud conviction should be vacated because the mail fraud statute "should . . . be construed *in pari materia* with the Hobbs Act, to require as an element of the crime, that Appellant actually obtained or sought to obtain money or property," *id.* at 161. He claimed that since he already possessed the property he was convicted of scheming to acquire, "obtaining" that property was impossible. *Id.* at 161–62. We

rejected the appellant's argument. We noted that "[a]lthough written in the disjunctive, the mail [and wire] fraud statute[s] do[] not criminalize two separate acts." *Id.* at 162. Instead, the statute is interpreted to criminalize any scheme or artifice for obtaining money or property. *Id.* However, we ruled that a "defendant does not need to literally 'obtain' money or property to violate the statute[s]." *Id.* "The fact that the Hobbs Act and the mail and wire fraud statutes contain the word 'obtain' does not necessitate imposing *Scheidler*'s construction of a wholly separate statute onto this Court's pre-existing construction of the mail fraud statute." *Id.* Thus, we rejected the appellant's argument that the mail fraud statute requires that defendants obtain or seek to obtain money or property. *Id.*

This view has been endorsed by our sister circuits. For instance, in *United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003), the Tenth Circuit specifically stated that "[i]n contrast to the Hobbs Act,

neither the mail nor wire fraud statute requires that a defendant 'obtain' property before violating the statute." *Id.* at 1108 n.27. In *United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004), the Third Circuit rejected defendants' argument that "any violation of the mail fraud statute must involve a scheme for obtaining the victim's property." *Id.* at 602. The Court reasoned that the mail fraud statute "was . . . intended to cover any scheme or artifice to defraud one of his money or property, *including* [but not limited to] any scheme for obtaining money or property by means of false or fraudulent promises." *Id.* (alterations and internal quotation marks omitted). The Court distinguished *Scheidler*, pointing out that "[u]nlike the mail fraud statute, the Hobbs Act expressly requires the Government to prove that the defendant 'obtain[ed] property from another.'" *Id.* at n.21 (quoting 18 U.S.C. § 1951(b)(2)). Similarly, in *United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358

(2010), the Ninth Circuit stated that "[f]raud to obtain property is one means of violating [18 U.S.C.] § 1343, but it is not the only means for doing so." *Id.* at 941.

Subsequently, in *Sekhar*, the Supreme Court applied *Scheidler* and held that Hobbs Act extortion requires that the extorted property be "obtainable." 133 S. Ct. at 2726. In *Sekhar*, the defendant threatened to disclose information about an alleged affair by the New York Comptroller's general counsel unless the general counsel recommended that the Comptroller invest in the defendant's investment fund. *Id.* at 2723. The defendant was convicted of attempted Hobbs Act extortion. *Id.* Quoting *Scheidler*, the Court stated that "[o]btaining property requires 'not only the deprivation but also the acquisition of property.'" *Id.* at 2725 (quoting *Scheidler*, 537 U.S. at 404). The Court concluded that "[t]he property extorted must therefore be *transferable*—that is, capable of passing from one person to another." *Id.* Applying this interpretation of the statute,

the Court held that the property right at issue—a positive recommendation by the general counsel to invest in the defendant's fund—was not "obtainable" and therefore vacated the defendant's extortion conviction. *Id.* at 2727.

Finazzo argues that *Sekhar* should be extended to the mail and wire fraud statutes to require that defrauded property be obtainable, and that under such an interpretation his mail and wire fraud convictions cannot stand. We reject this argument.[13] *Sekhar*'s conclusion that Hobbs Act property must be obtainable expressly rested on the fact that Hobbs Act extortion requires "the acquisition of property." 133 S. Ct. at 2725. Having ruled in *Porcelli* that, in contrast to the Hobbs Act extortion provision, the mail and wire fraud statutes do not require a defendant to obtain or seek to obtain

---

[13] Indeed, we have already rejected *Sekhar*'s application to the mail and wire fraud statutes in a summary order. *See United States v. Clark*, 593 F. App'x 53, 54 n.1 (2d Cir. 2014) (summary order) ("Clark's reliance on *Sekhar* . . . is misplaced. There, the Supreme Court analyzed the scope of the concept of 'property' for purposes of the Hobbs Act, not the wire fraud statute.").

property, we reject Finazzo's attempt to extend *Sekhar*'s obtainability requirement to the mail and wire fraud statutes.[14]

## 2. Scope of the "Right to Control"

Finazzo also argues that the "right to control" jury instructions permitted him to be convicted without causing or intending to cause cognizable harm under the mail and wire fraud

---

[14] In an effort to apply *Sekhar*'s holding to the mail and wire fraud statutes, Finazzo points to *Sekhar*'s mention of *Cleveland v. United States*, 531 U.S. 12 (2000), a mail-fraud case. *See Sekhar*, 133 S. Ct. at 2727. However, *Cleveland* did not concern an "obtainability" requirement. Instead, the *Cleveland* Court addressed the definition of "property." *See* 531 U.S. at 15. The Court concluded that § 1341 "requires the object of the fraud to be 'property' in the victim's hands." *Id.* at 26. Since a Louisiana video-poker license was not "property" of the state before it was issued, defrauding Louisiana to obtain such a license did not constitute mail fraud. *See id.* at 20–27. Requiring that the object of the fraud be property of the victim is separate from requiring that it be obtainable by the defendant. *See Hedaithy*, 392 F.3d at 602 ("[T]he [*Cleveland*] Court was not setting out a requirement that a mail fraud scheme must be designed to 'obtain' property. Rather, . . . the Court[] conclu[ded] that a victim has been defrauded of 'property,' within the meaning of the mail fraud statute, only if that which the victim was defrauded of is something that constitutes 'property' in the hands of the victim."). Since *Cleveland* does not relate to an obtainability requirement, we decline to construe *Sekhar*'s reference to *Cleveland* as an extension of *Sekhar*'s obtainability holding to the mail and wire fraud statutes. Rather, we read the Court's use of *Cleveland* to merely support its explanation of why the Government in *Sekhar* only "expend[ed] minuscule effort" defending the verdict form's definition of the property extorted: the verdict form's definition of the extorted property—"the General Counsel's recommendation to approve the Commitment"—likely did not constitute property of the State. *Sekhar*, 133 S. Ct. at 2727 (internal quotation marks omitted).

41

statutes, because the instructions erroneously described the "money or property" element.[15]

In relevant part, the district court instructed the jury that:

> [I]n order to prove a scheme to defraud, the government must prove that the alleged scheme contemplated depriving another of money or property. Property includes intangible interests such as the right to control the use of one's assets. This interest is injured when a victim is deprived of potentially valuable

[15] The parties discuss the question of whether the jury instructions allowed conviction under the "right to control" theory without harm or intent to harm as relating to both (1) the "materiality" of one's property rights under a right-to-control theory, and (2) the fraudulent-intent requirement under the "scheme to defraud" element. In *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), we framed the harm requirement under a "right to control" theory as being governed by the extent of the "money or property" element of the mail and wire fraud statutes. *See id.* at 1216–18. As discussed *infra*, we indicated that, to constitute "property," the deprivation of the right to control one's assets must be "material," which requires that the deprivation "can or does result in some tangible harm." *Id.* at 1217. We have also discussed the requisite harm under a "right to control" theory as being a question of fraudulent intent, requiring that defendants contemplated some actual, cognizable harm or injury to their victims. *See, e.g.*, *Binday*, 804 F.3d at 569–70; *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998). Although analyzed in the context of different elements, these inquiries contemplate the same underlying issue in this case—whether the jury instructions allowed the jury to convict Finazzo without proof that the scheme harmed or could have harmed Aéropostale. We believe the issue in this case is best understood as a question of whether Aéropostale's property rights were implicated. Therefore, we analyze it under the "money or property" element, while still applying our decisions under the fraudulent-intent requirement.

42

economic information it would consider valuable in deciding how to use its assets.

. . .

To act with "intent to defraud" means to act knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another.

Finazzo App'x at 97–98. These instructions are consistent with our

prior decisions and therefore not erroneous.

In *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991), we first

addressed the extent of the "right to control" aspect of mail fraud. *Id.*

at 462–63. We explained that "application of the [right to control]

theory is predicated on a showing that some person or entity has

been deprived of potentially valuable economic information." *Id.*

"Thus, the withholding or inaccurate reporting of information that

could impact on economic decisions can provide the basis for a mail

fraud prosecution." *Id.* at 463.

We considered the "right to control" further in *United States v.*

*Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). In *Mittelstaedt*, the defendant

43

served as a consulting engineer for two Long Island communities. *Id.* at 1210. He used his position to influence the town planning boards with respect to real estate projects in which he had an undisclosed interest. *Id.* at 1211. He was charged with mail fraud, and the district court instructed the jury that "the right to material information concerning the expenditure of public monies[] is a property right, intangible though it is, and it is included in the mail fraud statute." *Id.* at 1216. The defendant contended that the district court erred in refusing to give a proposed charge that the undisclosed information must have "placed the Village at an[] *economic* disadvantage . . . [in other words,] . . . such hidden interest [must have] caused the Village to purchase the property at a higher cost than it would have otherwise paid." *Id.* at 1216–17 (internal quotation marks omitted). The Government contended that it did not matter whether the towns would have suffered economic loss if the scheme had been successful "because the loss of the 'right to

control' the expenditure of public funds, through the loss of the ability to make a fully informed decision, is sufficient to constitute mail fraud." *Id.* at 1217.

We disagreed with the Government and ruled that "[w]here an individual standing in a fiduciary relation to another conceals material information that the fiduciary is legally obliged to disclose, that non-disclosure does not give rise to mail fraud liability unless the omission can or does result in some tangible harm."[16] *Id.* To give

[16] It is important to note that the concept of "materiality" discussed in *Mittelstaedt* is distinct from the separate requirement under the mail and wire fraud statutes that the defendant's misrepresentations be material. *See United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (listing "the materiality of the misrepresentations" as a separate requirement under the "scheme to defraud" element). "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013) (per curiam) (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)) (internal quotation marks and brackets omitted). The question of whether a defendant's misrepresentation was capable of influencing a decisionmaker should not be conflated with *Mittelstaedt's* requirement that that misrepresentation be capable of resulting in "tangible harm." 31 F.3d at 1217. It is certainly possible for a misrepresentation to influence decisionmaking in a manner that nevertheless does not produce tangible harm. In fact, *Mittelstaedt* specifically held that its "materiality" requirement is not *necessarily* satisfied where a misrepresentation influences a decisionmaker. *See id.* ("[L]ack of information that might have an

45

rise to liability, "the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *Id.* Thus, "lack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.'" *Id.* Rather, "[t]o convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature *or* that the village could have negotiated a better deal for itself if it had not been deceived." *Id.* Therefore, we concluded that the jury instructions were erroneous because they could have supported a conviction for a mere breach of fiduciary duty that did not cause tangible harm. *Id.* at 1218.

In subsequent cases, we further examined jury instructions describing the scope of the "right to control" property under the

---

impact on the decision regarding where . . . money is spent, without more, is not a tangible harm.").

mail and wire fraud statutes. For example, in *United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996), the defendant was charged with mail and wire fraud in connection with falsely stating his income to a bank to obtain a mortgage. *Id.* at 278–79. The district court instructed the jury that: "Under the mail fraud statute, the definition of property includes intangible property interests such as the right to control the use of one's own assets. This interest is injured when a person is deprived of *information he would consider valuable in deciding how to use his assets.*" *Id.* at 284. Notably, we stated that that instruction "might be deemed facially at odds with the *Mittelstaedt* formulation that 'lack of information that might have an impact on the decision regarding where [the defrauded party's] money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 "property."'" *Id.* (quoting *Mittelstaedt*, 31 F.3d at 1217). Nevertheless, we upheld the jury instructions because, under the facts of that case, we did not believe the instructions

prejudiced the defendant since the information withheld from the bank "significantly diminished the ultimate value of the [mortgage] transaction to the bank."[17] *Id.* (internal quotation marks omitted).

In a summary order, *United States v. Viloski*, 557 F. App'x 28 (2d Cir. 2014) (summary order), we more recently reviewed the requirements to support a conviction under the "right to control" theory of mail and wire fraud. In *Viloski*, the defendant acted as a broker and consultant for development projects of Dick's Sporting Goods, and passed on portions of his consulting fee to a Dick's employee as kickbacks for directing the business from Dick's to the defendant. *Id.* at 31. On appeal, the defendant argued that the indictment charging him with fraud did not adequately allege a violation of the right to control assets. *Id.* at 32–33. The indictment

[17] In a footnote in a summary order, *United States v. Levis*, 488 F. App'x 481 (2d Cir. 2012) (summary order), we cast doubt on the continued applicability of *Mittelstaedt*, citing *Dinome* as an example of a case in which we had "limited [*Mittelstaedt*] to its compelling factual setting." *Id.* at 486 n.2. However, *Dinome*'s holding does not call into question the applicability of *Mittelstaedt*'s tangible harm requirement. Instead, *Dinome* merely held that, even if the jury instruction violated *Mittelstaedt*, the defendant could not demonstrate prejudice on the facts of that case. *See Dinome*, 86 F.3d at 284.

alleged that the object of the defendant's scheme was "to obtain money and property, and to deprive Dick's of potentially valuable information that could impact on its economic decisions." *Id.* at 33 (internal quotation marks omitted). We rejected the defendant's argument, explaining that "[t]he deprivation of information that affects economic decisions is precisely the type of situation in which we have approved [the right to control] theory." *Id.* The defendant also challenged the district court's jury instructions on the "right to control." The district court instructed the jury that it could find deprivation of property "if [it found] beyond a reasonable doubt that an employee or officer of Dick's either failed to disclose or inaccurately reported *economically material information* that the officer or employee had reason to believe would have caused Dick's to change its business conduct." *Id.* at 34 (internal quotation marks omitted). We upheld that instruction, ruling that "[t]he requirement that the information be economically material avoids the

49

*Mittelsta[e]dt* problem of deprivation of information that could not lead to tangible harm." *Id.* We also held that there was sufficient evidence to satisfy the tangible-harm requirement: "[T]he deprivation of information regarding . . . kickbacks was material and potentially could result in tangible harm because Dick's could have negotiated better deals for itself." *Id.*

In *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015), the defendants fraudulently applied for life insurance policies on "straw insureds" by claiming that the policies were being obtained for legitimate estate-planning purposes, but instead sold the policies to investors. *Id.* at 564–67. The jury instructions stated that "the loss of the right to control money or property constitutes deprivation of money or property only when the scheme, if it were to succeed, would result in economic harm to the victim." *Id.* at 581. The instruction further clarified: "If all the government proves is that under the scheme the insurance companies would enter into

50

transactions that they otherwise would not have entered into, without proving that the ostensible victims would thereby have suffered some economic harm, then the government will not have met its burden of proof." *Id.* The defendants claimed that the jury instructions permitted conviction on a "right to control" theory absent a showing of cognizable harm. *Id.* at 581–82. We had no difficulty rejecting that argument, reasoning that the charge "directly explained" that conviction required the government to prove cognizable harm to the insurers through deprivation of information that was of economic consequence. *Id.* at 570, 582.

The common thread of these decisions is that misrepresentations or non-disclosure of information cannot support a conviction under the "right to control" theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm. This economic harm can be manifested directly—such as by increasing the price the victim paid for a good—or

51

indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received. *See Mittelstaedt*, 31 F.3d at 1217 ("[T]he government had to establish that the omission caused (or was intended to cause) actual harm to the [victim] of a pecuniary nature *or* that the [victim] could have negotiated a better deal for itself if it had not been deceived."); *United States v. Schwartz*, 924 F.2d 410, 420–21 (2d Cir. 1991) (affirming wire fraud convictions for misrepresentations to seller that night-vision goggles would not be used illegally, even though the seller suffered no direct pecuniary harm, in part because the use of the night-vision goggles to violate arms export laws cost the seller "good will"). However, not every non-disclosure or misrepresentation that could affect someone's decision of how to use his or her assets is sufficient to support a mail or wire fraud conviction. *See Mittelstaedt*, 31 F.3d at 1217. The fraudulent scheme must implicate tangible economic harm.[18]

---

[18] To illustrate these distinctions, consider a scenario in which a clothing retailer does business with a supplier, and the supplier misrepresents its identity to the

We are satisfied that the district court's jury instructions adequately conveyed the scope of the "right to control" theory. The district court informed the jury that the "right to control" one's assets is injured "when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets." Finazzo App'x at 98. Depriving a victim of "potentially valuable" information *necessarily* creates a risk of tangible economic harm. *See* Black's Law Dictionary 1784 (10th ed.

retailer. The nature of this misrepresentation determines whether it is actionable under the "right to control" theory. Let us assume that the supplier falsely represents itself as a different, well-established supplier with a reputation for high-quality goods. Due to this misrepresentation, the supplier is able to charge the retailer higher prices for its goods than it otherwise could have charged. In this case, the "right to control" theory is implicated because the seller's misrepresentation resulted in economic harm to the retailer, in the form of higher prices. Consider, instead, a situation in which the supplier is known to use child labor and misrepresents its identity to conceal that fact from the retailer, who has pledged not to transact with the supplier in order to avoid angering its customers. The "right to control" theory may be implicated if the Government can prove that the reputational harm to the retailer caused by the misrepresentation could lead or did lead to economic losses. However, what if the supplier misrepresents its identity merely because the retailer's board of directors has agreed not to transact business with the supplier due to inter-personal animus? In that situation, the Government would likely be able to easily prove that the supplier's misrepresentation affected the retailer's decisionmaking on how to use its assets. However, since the misrepresentation does not seem to implicate tangible economic harm to the retailer, the "right to control" theory would not be applicable.

2014) (defining "valuable" as "[w]orth a good price" or "having financial or market value"); Merriam-Webster's Collegiate Dictionary 1305 (10th ed. 1997) (defining "valuable" as "having monetary value"). Therefore, by requiring the jury to find that Aéropostale was deprived of "potentially valuable economic information," the jury instructions adequately conveyed the requirement that the deprivation of the right to control assets must be capable of creating tangible economic harm.

Moreover, we have repeatedly used the phrase "potentially valuable economic information" to describe the scope of the "right to control" theory. In *Wallach*, we stated that "application of the [right to control] theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information." 935 F.2d at 462–63. We used this same language again in *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("Th[e] [right to control] theory is predicated on a showing that some person

54

or entity has been deprived of potentially valuable economic information." (quoting *Wallach*, 935 F.2d at 462–63) (internal quotation marks omitted)), and in *Dinome*, 86 F.3d at 283 ("This right to control theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information." (quoting *D'Amato*, 39 F.3d at 1257) (internal quotation marks omitted)); *see also United States v. Tagliaferri*, 648 F. App'x 99, 103 (2d Cir. 2016) (summary order); *Viloski*, 557 F. App'x at 32–33; *United States v. Levis*, 488 F. App'x 481, 485 (2d Cir. 2012) (summary order). Most recently, in *Binday*, we used this language in describing in detail the scope of the "right to control" theory. 804 F.3d at 570. We explained that "[i]t is not sufficient . . . to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations." *Id.* "The 'right to control one's assets' does not render every transaction induced by deceit actionable under the mail and wire fraud statutes.

55

Rather, the deceit must deprive the victim 'of potentially valuable economic information.'" *Id.*

Furthermore, the jury instructions in this case closely track the jury instructions in *Viloski*—which we upheld—far more than they track the jury instructions in *Dinome*—with which we had more difficulty. In *Dinome*, the jury instructions stated that the "right to control" is injured when a person is deprived of "information he would consider valuable in deciding how to use his assets." *Dinome*, 86 F.3d at 280. We concluded that that instruction might have vitiated *Mittelstaedt*'s tangible-harm requirement. *Id.* at 284. In contrast, the jury instructions in *Viloski* required that Dick's Sporting Goods be deprived of "economically material information that the officer or employee had reason to believe would have caused Dick's to change its business conduct." 557 F. App'x at 34 (emphasis omitted). We specifically stated that the "requirement that the information be economically material" rendered the jury instruction

56

proper under *Mittelstaedt*. *Id.* Similarly, requiring that a victim be deprived of "potentially valuable economic information"—rather than merely "information," as in *Dinome*—distinguishes this case from *Dinome*, especially where the added language is so frequently used by this Court to describe the "right to control" theory's tangible-harm requirement.[19]

---

[19] Finazzo also argues that the jury instructions were erroneous because they allowed conviction if Finazzo "intended to deprive Aéropostale of information that Aéropostale would *subjectively* consider valuable in its decision making." Finazzo Br. at 57 (emphasis added). We have not decided whether *Mittelstaedt*'s tangible-harm requirement requires objective harm, or whether subjective harm to the victim would suffice. However, we cast doubt on the jury instructions in *Dinome*, which merely referenced the victim's subjective valuation of the deprived information. See *Dinome*, 86 F.3d at 284 (stating that jury instructions that provided that someone's right to control property is injured when he is "deprived of information he would consider valuable in deciding how to use his assets" might be deemed "facially at odds with the *Mittelstaedt* formulation"). We need not decide here whether *Mittelstaedt*'s tangible-harm requirement is only satisfied by objective harm, because, assuming *arguendo* that it is, the jury instructions were proper. Although the district court's instruction did include a subjective element, requiring that the victim "would consider [the deprived information] valuable in deciding how to use its assets," Finazzo App'x at 98, the instruction explained that the information must be "potentially valuable economic information" prior to addressing the victim's subjective valuation of the information, *id.* This conveyed to the jury that the deprived information must also be objectively valuable.

57

For the foregoing reasons, we hold that the district court's jury instructions adequately conveyed the scope of the "right to control" theory.[20]

B. Sufficiency of the Evidence: Right to Control

Finazzo also challenges the sufficiency of the evidence supporting his mail and wire fraud convictions under the "right to control" theory. "We review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction by viewing the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Daugerdas*, 837 F.3d 212, 221 (2d Cir. 2016) (internal quotation marks and alterations omitted). "We will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the

---

[20] While we hold that the district court's jury instructions were adequate to convey the tangible-harm requirement, we believe the requirement could be more directly communicated as follows: "The loss of the right to control money or property only constitutes deprivation of money or property if the scheme could cause or did cause tangible economic harm to the victim."

crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

There was ample evidence to support the jury's conclusion that Finazzo intended to cause (and did cause) tangible economic harm to Aéropostale. Through his fraudulent scheme to deprive Aéropostale of information regarding his related-party transactions, Finazzo used his control over Aéropostale's vendor selection and pricing to steer Aéropostale's business towards South Bay, which provided inferior products and charged higher prices than other vendors.

As described more fully above, the Government presented many witnesses who testified that Finazzo had control over Aéropostale's vendor selection and pricing in the graphic T-shirt and fleece businesses. For example, Julian Geiger—Aéropostale's CEO—testified that Finazzo was primarily responsible for Aéropostale's vendor selection and vendor pricing. CFO Michael

Cunningham similarly stated that the quantities of goods bought from vendors needed to be approved by Finazzo and that Finazzo negotiated the final price with vendors. Other Aéropostale personnel testified similarly. For example, General Counsel Slezak testified that Finazzo "decided what type of product we would buy, how much of it, [and] which vendors would manufacture the product." Dey App'x at 829. Meanwhile, John DiBarto, a merchandising manager, explained that Finazzo was responsible for negotiating prices for graphic T-shirts with South Bay. He stated that asking for a reduction in price from South Bay would have been futile because Finazzo was "in charge of that." *Id.* at 1128–29. Megan Lauritano, a product manager, testified that Finazzo determined the price and quantity of fleece orders from South Bay. In discussing vendor structure, Finazzo himself said "I guess I can make that decision." *Id.* at 1175. The evidence also indicated that Finazzo would not have been able to achieve this control without

misrepresenting his interest in South Bay: Peter Conefry testified that Finazzo decided not to disclose his interest in South Bay to Aéropostale because Finazzo "didn't think Aéropostale would go for it." *Id.* at 1229.

The evidence was certainly sufficient for the jury to conclude that Finazzo exercised his control to steer business to South Bay and to set the prices Aéropostale paid South Bay. Moreover, he actively discouraged—and rejected—use of other vendors. For example, Jennifer Heiser, an employee who reported to Finazzo, testified that she placed 97–99% of her graphic T-shirt orders with South Bay, as a result of pressure from Finazzo. She also stated that Finazzo fired an employee who challenged him regarding the use of South Bay as a graphic T-shirt vendor. DiBarto recalled that Finazzo yelled at him when he suggested comparing South Bay's prices with another vendor. DiBarto also testified to an email in which Finazzo said he would "be swift in [his] actions" against an employee who had

questioned South Bay's costing structure. *Id.* at 1144–45. Jill Kronenberg, the head of the Women's Division, testified that she shifted Aéropostale's women's graphic T-shirt business from Mias to South Bay because she "had no choice." *Id.* at 994–95. Furthermore, Geiger and Cunningham both testified that Finazzo became angry and would end the conversation when scrutiny was placed on South Bay at executive meetings.

There was also ample evidence that, in steering business towards South Bay, Finazzo tangibly harmed Aéropostale. Slezak and Geiger both testified that Finazzo's scheme directly prevented Aéropostale from receiving the best possible bargain. Indeed, Geiger and Heiser testified that Aéropostale's profit margins on graphic T-shirts were less than their profit margins on other similar products. Furthermore, Kronenberg and Jinah Jung, a product manager, stated that South Bay's women's graphic T-shirts and fleeces were inferior in quality to other vendors' products, and Heiser testified that the

62

near-exclusive use of South Bay for men's graphic T-shirts prevented Aéropostale from receiving the best quality products. This provided sufficient evidence from which a jury could reasonably conclude that Aéropostale was harmed by its dealings with South Bay.[21]

The Government also presented multiple specific instances of harm. Geiger and Cunningham both testified that Finazzo refused to shift 25% of South Bay's graphic T-shirt business overseas, despite estimates that it would save Aéropostale $5–6 million. Jung testified to an email Finazzo sent rejecting Jung's proposal to save $300,000 on a fleece order by using a different vendor. Lauritano and George Justin Meno, also a product manager, both explained that South Bay had significant delivery delays on fleece products that Aéropostale did not experience with other fleece vendors. Meno estimated that the delays that occurred in 2005 and 2006 cost Aéropostale approximately $1.8 million.

---

[21] This evidence of the inferiority of Aéropostale's contracts with South Bay supports each of the substantive mail and wire counts of conviction.

Thus, there was sufficient evidence that, by depriving Aéropostale of information regarding his interest in South Bay, Finazzo was able to steer a significant amount of business to South Bay in a manner that inflicted tangible economic harm on Aéropostale. The jury could reasonably conclude that Aéropostale "could have negotiated a better deal for itself if it had not been deceived" by Finazzo, *Mittelstaedt*, 31 F.3d at 1217, and that Finazzo's participation in the scheme evinced fraudulent intent, *see D'Amato*, 39 F.3d at 1257 ("When the necessary result of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." (internal quotation marks omitted)).

Finazzo's reliance on *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) is misplaced. In *Starr*, the defendants operated a bulk mail service. *Id.* at 95. Customers calculated postage for their mail themselves and paid the defendants. *Id.* at 96. The defendants hid mail subject to higher postage rates among lower-priced mail,

allowing the defendants to pay lower postage than the customers had paid them. *Id.* We concluded that there was insufficient evidence of intent to inflict harm on the customers. *Id.* at 99. We reasoned that the customers "received exactly what they paid for," because the defendants "did in fact mail their customers' brochures promptly as promised and caused them to arrive at the correct destination." *Id.* at 98–99. Finazzo argues that Aéropostale also received the value of its bargain with South Bay, which he claims was unaffected by his interest in South Bay. This argument misses a crucial distinction. In *Starr*, the customers freely bargained for a service and received that service. In contrast, Aéropostale did not freely bargain with South Bay. Instead, Finazzo exercised his control to steer business towards South Bay and to commit Aéropostale to paying excessive prices. By inducing Aéropostale to enter into disadvantageous bargains, Finazzo harmed Aéropostale because it

65

could have negotiated a better deal absent Finazzo's fraudulent scheme.

Finally, Finazzo argues that the jury's special verdict foreclosed a finding of intended harm. He claims that the Government only attempted to prove that Finazzo harmed Aéropostale by depriving it of money. He then points to the jury's finding that Finazzo was not guilty on the basis of the intent to deprive Aéropostale of money for each substantive mail and wire fraud count[22] and suggests that no other intended harm could sustain the "right to control" convictions. Even if this conclusion by the jury could be interpreted as precluding consideration of the undisclosed kickbacks Finazzo received, Finazzo's argument ignores

---

[22] At trial the Government presented evidence through Special Agent Braconi of the amount of kickbacks received by Finazzo for four years of the scheme to defraud (2002 through 2006), but it did not present evidence of the specific amounts of kickbacks Finazzo received for each of the payments set forth in the separate wire and mail fraud counts. As to those substantive counts (two through sixteen), the Government's evidence included gross amounts sent by check and wire from Aéropostale to South Bay to satisfy the respective "mailing" and "use of the wires" elements of each of those counts.

66

the substantial evidence that he harmed Aéropostale in more ways than simply depriving it of money through his receipt of kickbacks. For instance, as noted above, the jury heard testimony that the products South Bay provided were of inferior quality. It also heard substantial testimony regarding South Bay's delivery delays for fleece products. Thus, the jury's findings regarding Finazzo's intent to deprive Aéropostale of money do not foreclose the "right to control" convictions.

We therefore hold that there was sufficient evidence to support Finazzo's convictions for depriving Aéropostale of its right to control its assets.[23]

C. <u>Restitution</u>

On August 1, 2014, prior to sentencing, the district court issued a Memorandum and Order that, *inter alia*, explained the

---

[23] Finazzo also argues that there was insufficient evidence to support his convictions because there was no evidence that Aéropostale's corporate governance was obtainable property. Having determined that the mail and wire fraud statutes do not require property to be obtainable, *supra* at 34–41, we reject this challenge.

court's restitution order against Finazzo and Dey. The court began by concluding that the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, applied. The court noted that, for the purposes of restitution, it would only consider Defendants' convictions for conspiracy to violate the Travel Act and Finazzo's conviction for mail fraud conspiracy on the basis of intent to deprive Aéropostale of money. The court stated that it therefore need not reach Finazzo's argument that convictions predicated on depriving Aéropostale of its right to control property did not constitute offenses against property within the meaning of the MVRA. The court concluded that "the MVRA unquestionably applies to Finazzo's conviction for conspiracy to commit mail fraud with the intent to deprive Aéropostale of money." Dey App'x at 2531. It further concluded that Defendants' Travel Act conspiracy "was plainly committed in a fraudulent and deceitful manner, which

68

renders it an offense against property within the meaning of the MVRA." *Id.* at 2535.[24]

Having determined that the MVRA applied, the district court then concluded that Aéropostale was directly harmed by the Defendants' conspiracy. The court explained that "[D]efendants' scheme inflated prices Aéropostale paid to South Bay." *Id.* at 2539. Specifically, the court found that Defendants "duped Aéropostale into paying millions of dollars in kickbacks to its own senior executive." *Id.* at 2539–40. Those kickbacks were "drawn directly from Aéropostale's payments for South Bay's goods," and "Aéropostale 'would not have made th[ose] payments to the defendant[s] had they known about the fraudulent scheme.'" *Id.* at 2540 (quoting *United States v. Archer*, 671 F.3d 149, 171 (2d Cir. 2011)).

---

[24] The district court concluded, in the alternative, that the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, supported restitution as well. However, we need not address this issue, since the Defendants do not challenge the applicability of the MVRA on appeal.

Next, the district court stated that the value of the kickbacks received by Finazzo was a reasonable measure of the pecuniary loss suffered by Aéropostale. The court acknowledged that, for the purposes of restitution, a defendant's illegal gains cannot be substituted for a victim's actual loss. However, it pointed out that, in *United States v. Zangari*, 677 F.3d 86 (2d Cir. 2012), this Court recognized that "there may be cases where there is a direct correlation between [the defendant's] gain and [the victim's] loss, such that the defendant's gain can act as a *measure* of—as opposed to a *substitute* for—the victim's loss." Dey App'x at 2544 (quoting *Zangari*, 677 F.3d at 93). The district court ultimately concluded that this case fell within *Zangari*'s "direct correlation" exception because "the kickbacks received by Finazzo accurately and reasonably capture[d] the character of the fraud in this case, which relied on extracting substantial hidden profits from the amounts Aéropostale paid to South Bay." Dey App'x at 2546–47.

Addressing the Defendants' argument that the Government failed to offer adequate evidence of inflated prices, the court stated that the Defendants had failed to rebut the fact that "a portion of every payment Aéropostale made went toward generating secret kickbacks for Finazzo" that were "not justified by any features of South Bay's business model." *Id.* at 2549. Furthermore, the court noted that the Government *had* offered evidence of inflated prices, including Jung's and Geiger's testimony. Thus, the court ruled that there was "a direct correlation between the prices Aéropostale paid, the profits South Bay accrued, and the kickbacks Dey paid to Finazzo from those profits." *Id.* at 2550.

The court held the Defendants jointly and severally liable for restitution to Aéropostale in the amount of $25,790,822.94—the value of the kickbacks received by Finazzo from 2002 through 2006. However, the court offset that amount by $5 million and $7.1 million

71

previously paid in civil settlements by Finazzo and Dey respectively, leaving $13,690,822.94 in restitution.

Finazzo and Dey challenge the district court's restitution calculation, arguing that the district court improperly used Finazzo's gain as a measure of Aéropostale's loss. "We review a district court's restitution order for abuse of discretion, which we will identify only if the order 'rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions.'" *United States v. Messina*, 806 F.3d 55, 67 (2d Cir. 2015) (quoting *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015)).

"Under the MVRA, restitution is mandatory for certain crimes, . . . 'including any offense committed by fraud or deceit.'" *United States v. Battista*, 575 F.3d 226, 230 (2d Cir. 2009) (quoting 18 U.S.C. § 3663A(c)(1)(A)(ii)). District courts must order restitution where "an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). The Government bears the burden

of proving a victim's actual loss by a preponderance of the evidence. *Zangari*, 677 F.3d at 92. However, the MVRA "requires only a reasonable approximation of losses supported by a sound methodology." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013).

"The goal of restitution, in the criminal context, is 'to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury.'" *Battista*, 575 F.3d at 229 (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006)). Since the purpose of restitution is compensatory and the MVRA limits restitution to the amount of each victim's losses, "a restitution order must be tied to the victim's actual, provable, loss." *Zangari*, 677 F.3d at 91.

Accordingly, in *Zangari*, we held that a district court "may not substitute a defendant's ill-gotten gains for the victim's actual loss" when calculating restitution under the MVRA. *Id.* at 93. We noted, however, that "there may be cases where there is a direct correlation

73

between gain and loss, such that the defendant's gain can act as a *measure* of—as opposed to a *substitute* for—the victim's loss." *Id.* at 93. In *Zangari*, the defendant induced the victims to pay sham finder's fees as part of their collateral in a stock-loan transaction. *Id.* at 89. We concluded that there was not a direct correlation between the defendant's gain and the victims' loss, because the collateral would eventually be returned at the end of the stock-loan period. *Id.* at 93–94. Thus, the victims' loss could only have come in the form of opportunity cost, which was not directly correlated with the defendant's gain. *Id.* However, we cited *United States v. Berardini*, 112 F.3d 606 (2d Cir. 1997), as an example of a case in which there *was* a direct correlation between the defendant's gain and the victims' loss. *See Zangari*, 677 F.3d at 93. There, the defendant's gain constituted income from fraudulent telemarketing sales. *Berardini*, 112 F.3d at 607–10. A direct correlation existed in those circumstances because

74

every dollar gained by the defendant was necessarily lost by victims who paid for the fraudulent products.

Here, the district court concluded that there was a direct correlation between Finazzo's gains and Aéropostale's losses. It reasoned that "a portion of every payment Aéropostale made went toward generating secret kickbacks for Finazzo [that were] . . . not justified by any features of South Bay's business model." Dey App'x at 2549. However, we are not convinced that the district court employed a sound methodology that supported a conclusion that there was a "direct correlation" between Finazzo's gains and Aéropostale's losses.

Finazzo's gains constitute the kickbacks he received from Dey for steering Aéropostale's business to South Bay and negotiating the prices paid for South Bay's products. It certainly can be assumed that Dey would not have paid Finazzo the kickbacks unless the fraudulent scheme was profitable for Dey. It is possible that Finazzo

75

made the kickback scheme profitable for Dey *solely* by inflating the prices Aéropostale paid South Bay, in which case Finazzo's gain would equal Aéropostale's loss. *See United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) (suggesting that "a natural result of paying kickbacks is inflation of the charges in order to make the scheme profitable for the payer of the kickbacks"); *United States v. Vaghela*, 169 F.3d 729, 736 (11th Cir. 1999) ("[I]t is not unreasonable to assume that [the victim] was overcharged in the amount of the kickbacks, and that the loss [the victim] suffered was equivalent to that amount."). However, unlike the defendant's gain in *Berardini*, loss to Aéropostale is not a *necessary* consequence of all the kickbacks Finazzo received. For instance, even without inflating the price—and therefore, without inflicting pecuniary loss on Aéropostale—South Bay would receive some profit from any sales to Aéropostale. A portion of Finazzo's worth to South Bay may, therefore, simply derive from steering additional business to South

76

Bay at a *non-inflated* price. Similarly, Finazzo's conduct may have reduced transactions costs for South Bay. These factors could increase Finazzo's worth to Dey and therefore make the kickback scheme profitable for Dey, without inflicting pecuniary loss on Aéropostale.[25] Given that we require a "direct correlation" between a defendant's gain and a victim's loss in order for restitution to be measured according to that gain, it is not a sufficiently sound methodology for the district court to merely assume that the kickbacks were *solely* justified by inflated prices. Instead, the district court must employ a methodology to determine whether the

---

[25] To illustrate, let us assume that it costs vendors $3 to produce a graphic T-shirt, and that a non-inflated price for vendors selling graphic T-shirts is $5. Thus, without inflicting loss on Aéropostale, a vendor would gain $2 in profit from every sale to Aéropostale. Without Finazzo's presence, South Bay would make no sales and therefore gain $0 in profit. With Finazzo's assistance, let's assume that South Bay would sell Aéropostale 100 graphic T-shirts, and that the price South Bay charged Aéropostale would be inflated to $6. South Bay would gain $3 profit per shirt, for a total of $300 of profit. In this case, Dey might be willing to split the $300 profits with Finazzo. After all, Dey would still be left with $150 under the scheme, instead of $0 without it. Meanwhile, though, Aéropostale would only have lost $100—the additional $1 per shirt that it paid above the non-inflated price. Thus, in this example, even though Finazzo inflated the price Aéropostale paid, there is not a "direct correlation" between Finazzo's gain ($150) and Aéropostale's loss ($100).

77

entirety of Finazzo's kickbacks was solely derived from activity that caused loss to Aéropostale. We therefore vacate and remand the district court's restitution calculation regarding Finazzo and Dey, so that the district court may employ a methodology to determine what portion of Finazzo's gain is directly correlated with Aéropostale's loss, or employ some other means of calculating Aéropostale's loss.[26]

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** in part and **VACATE** and **REMAND** in part for further proceedings the district court's judgments.

---

[26] In making these determinations, the district court may find it necessary to request additional documentation or testimony under 18 U.S.C. § 3664(d)(4). *See Zangari*, 677 F.3d at 93.